2001 D.S.D. 22

**BIG STONE BROADCASTING, INC., Plaintiff,**

v.

**Dr. Buron LINDBLOOM, in his official capacity as Chairman of the South Dakota Aeronautics Commission, et al., Defendants.**

No. 00–1012.

United States District Court,
D. South Dakota,
Northern Division.

Aug. 27, 2001.

Brent A. Wilbur, Neil K. Fulton, May, Adam, Gerdes & Thompson, Pierre, John L. Krenn, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, for Plaintiffs.

Mark T. Quinlivan, U.S. Dept. of Justice, Washington, DC, Amicus Curiae, for Plaintiffs.

Darin P. Bergquist, Department of Transportation Legal Division, Pierre, for Defendants.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

[¶ 1.] Plaintiff Big Stone Broadcasting, Inc. ("Big Stone") instituted this action for declaratory and injunctive relief against the seven members of the South Dakota Aeronautics Commission (SDAC) and the South Dakota Attorney General (collectively "defendants"), claiming that SDCL Chapter 50–9 and ARSD 70:02:03, which govern the construction of structures over 200 feet in height, have been preempted by the Federal Aviation Act of 1958 ("the Act"), 49 U.S.C. § 1301 *et. seq.*, and by Part 77 of the Federal Aviation Administration (FAA) Regulations governing "Objects Affecting Navigable Airspace," 14 C.F.R. § 77. Both parties, pursuant to Fed. R.Civ.P. 56, have moved for summary judgment. All parties agree that there are no genuine issues of material fact and that summary judgment in some form is appropriate. In addition, Big Stone has moved for an order under Fed.R.Civ.P. 12(f) to strike an affidavit which was submitted by defendants in support of their motion for summary judgment. After careful review of the motions, briefs, and oral argument, the court concludes that Big Stone's motion to strike should be denied and that Big Stone is entitled to judgment as a matter of law on some issues.

## FACTUAL BACKGROUND

[¶ 2.] This case concerns the proposed construction of a radio broadcast tower near South Shore, South Dakota. If completed, the tower would have a height of 875 feet and would be located approximately 900 feet south of the centerline of South Dakota Highway 20. Due to the intricacies of broadcast signals and the necessity of avoiding impermissible interference with other broadcast signals, the placement of the tower at the disputed location is the only location that would allow Big Stone to provide service to both Ortonville, Minnesota, and Watertown, South Dakota.

[¶ 3.] In July of 1999, Big Stone, via its predecessor in interest, Pheasant Country Broadcasting, Inc.,[1] filed an application for construction with both the Federal Communications Commission (FCC) and the FAA. Because of the height of the proposed tower, FCC regulations, 47 C.F.R. § 17.7, mandate that notice be given of the proposed construction to the FAA, which determines whether the proposed construction will present a hazard to air traffic safety. According to its own guidelines, 47 C.F.R. § 17.4(b), the FCC can only authorize the construction of such a tower if the applicant provides the FCC with a "no hazard" determination from the FAA.

[¶ 4.] The FAA, pursuant to 49 U.S.C. § 40103, has adopted regulations for making its "no hazard" determinations. Specifically, Part 77 of Title 14 of the Code of Federal Regulations, which is entitled "Objects Affecting Navigable Airspace," sets out the FAA's regulations in detail. Subpart B requires persons proposing certain types of construction or alteration to give notice to the Administrator of the FAA. Subpart C sets precise standards to determine whether an object is an obstruction to "the use of navigable airspace by aircraft and to existing air navigation facilities, such as an air navigation aid, airport, Federal airway, instrument approach or departure procedure, or approved off-airway route." 14 C.F.R. § 77.21. Subpart D explains how the FAA will conduct its aeronautical studies to evaluate proposed construction or alteration effects on the use of air navigation facilities or navigable airspace by aircraft, and it also formalizes the procedure for review. Subpart E provides comprehensive rules of practice for hearings before the FAA regarding hazards to air navigation, and subpart F details procedures which allow the grouping of antenna structures to localize their effect on the use of navigable airspace.

[¶ 5.] In October of 1999, the FAA completed an aeronautical study concerning the proposed tower. As part of the study, the FAA gave notice of the proposed construction and received no objections to it. South Dakota did not participate in this process. In addition, the FAA assessed the impact the proposed tower would have on existing and planned visual flight rules (VFR)[2] operations and procedures. The study determined that because there was no evidence of a significant volume of VFR activity in the area of the proposal, the proposed structure would have no substantial adverse effect on VFR operations. The FAA concluded that the proposed construction would not be a hazard to air navigation and issued a "no hazard" deter-

---

1. Big Stone obtained a *pro forma* assignment of a license granted by the Federal Communications Commission to Pheasant Country in October of 1999.

2. VFR's are systems that permit a pilot to follow some object, such as a road or railroad tracks, to a locality with an airport. Such systems become important if a plane's instruments fail or if a non-instrument rated pilot has flown into bad weather conditions. The VFR routes give the pilot a visual route to follow which will hopefully lead to an airport.

mination. South Dakota did not challenge this determination, within the FAA or otherwise. Based on the FAA's determination, the FCC granted Big Stone a construction permit on February 14, 2000.

[¶ 6.] At the same time Big Stone sought approval from the FCC and FAA in July of 1999, Big Stone also applied for permission to construct the tower from the SDAC which has the duty to "foster air commerce with the state of South Dakota and ... supervision over the aeronautical activities and facilities within the state[.]" SDCL 50–2–5. Obtaining such permission is required by SDCL 50–9–7, and the regulations enacted pursuant thereto, ARSD 70:02:03:19.

[¶ 7.] On February 17, 2000, SDAC held a hearing to consider Big Stone's application. SDAC denied the application by written order on February 26, 2000. When SDAC denied Big Stone's application, it knew of the previous FAA determination of "no hazard." SDAC based its denial on ARSD 70:02:03:20, a regulation it had previously promulgated, which states:

> Highways of the state trunk highway system [3] designated in SDCL 31–4, are considered to be VFR flyways. If the proposed structure is located within 500 feet on either side of the centerline of a state trunk highway, the elevation of the proposed structure may not be more than 200 feet above the ground. If the proposed structure is located 500 feet or more from either side of the centerline of a highway, the height of the structure may not increase at a slope greater than 7:1 extending upward and outward.

SDAC determined that Big Stone's proposed construction would violate the protected airspace established in ARSD 70:02:03:20 by 618.2 feet. Based upon its penetration into the protected highway flight space, SDAC determined that the proposed tower constituted a hazard and denied Big Stone's application.

[¶ 8.] The claimed purpose behind SDAC's creation of VFR flight routes along the state trunk highways is to provide a safe harbor for pilots of small private aircraft. Pilots, especially those flying small planes ill-equipped for flying in bad weather and flying without an instrument rating, can descend to an elevation low enough to see the ground for navigational purposes until a suitable landing location can be found. Pilots can find such suitable landing locations, i.e. airports, by following a state trunk highway which will lead them to the nearest town with an airport. Obviously, tall towers and other structures could be potential hazards to any airplane that is following a state trunk highway.[4] Because of that potential danger, and notwithstanding the fact that the FAA had issued a "no hazard" determination, SDAC denied Big Stone's application.

[¶ 9.] Soon thereafter, Big Stone filed suit in this court requesting both declaratory and injunctive relief.[5] Big Stone's primary

---

3. It is undisputed that State Highway 20 is a part of the state trunk highway system.

4. It must be noted that the safety zone created by the VFR state trunk highway system is limited at best. A pilot would only be safe flying at low altitudes using the VFR state trunk system if the pilot was flying parallel to the highway. For example, State Highway 20 primarily runs east and west. Thus, the safe zone created by the VFR above Highway 20 necessarily runs east and west as well, directly above it. If a pilot were to descend to a low altitude in an attempt to use the VFR state trunk highway system at Highway 20, the pilot may have to fly north or south to locate it. Because the safe zone would only run east and west above the highway, it would provide little comfort at all to the pilot flying north or south. While flying north or south searching for Highway 20, the pilot could not rely on the VFR state trunk highway system to keep clear of tall structures. In such a situation, the system would provide little, if any, use.

5. After SDAC denied Big Stone's application, Big Stone took advantage of the statutory

argument is that the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et. seq.*, and the federal regulations, 14 C.F.R. § 77, have completely preempted the field of aviation and air safety, rendering any inconsistent state action in such areas preempted by virtue of the Supremacy Clause of the United States Constitution.[6] Defendants, not surprisingly, take the opposite view, contending that the field of aviation and air safety have not been completely preempted. Defendants concede that were this court to find preemption, SDAC's decision regarding Big Stone must be reversed. However, defendants request that the court stop short of declaring all of SDCL Chapter 50–9 and any regulations enacted pursuant thereto unconstitutional, arguing that the enforcement mechanisms given to SDAC are necessary to enforce any FAA hazard determinations, as the FAA has no enforcement power itself.

[¶ 10.] Both parties, pursuant to Fed. R.Civ.P. 56, have moved for summary judgment. In support of their motions, both parties filed briefs, statements of claimed undisputed facts, and affidavits. In response to an affidavit filed on behalf of defendants, Big Stone has moved for an order that it be stricken pursuant to Fed. R.Civ.P. 12(f). The court will first dispose of the motion to strike and then proceed to the cross-motions for summary judgment.

## ANALYSIS

### I. PLAINTIFF'S MOTION TO STRIKE

[¶ 11.] In support of their motion for summary judgment, defendants submitted the affidavit of defendant Harley Taylor, a member of SDAC. Plaintiff, pursuant to Fed.R.Civ.P. 12(f), moved to strike the affidavit, claiming that it is immaterial to the issues presented.

[¶ 12.] Rule 12(f) expressly authorizes the court to strike "from any *pleading* any insufficient defense or any redundant, immaterial, impertinent, or scandalous material." Fed.R.Civ.P. 12(f) (emphasis added). In ruling on a Rule 12(f) motion, the court has considerable discretion. *See Nationwide Ins. Co. v. Central Missouri Electric Coop., Inc.,* —— F.3d —— (8th Cir.2001) (located at 2001 WL 856259). Thus, the determinative question is whether an affidavit in support of a motion for summary judgment constitutes a pleading. This court agrees with the overwhelming weight of authority that it does not. *See, e.g., Sellers v. Henman,* 41 F.3d 1100, 1101 (7th Cir.1994) (stating that an affidavit is not a pleading), *York v. Ferris State Univ.,* 36 F.Supp.2d 976, 980 (W.D.Mich.1998) (stating that an affidavit is not a "pleading" under Rule 12(f)), *EEOC v. Admiral Maintenance Serv., L.P.,* 174 F.R.D. 643 (N.D.Ill.1997) (holding that an affidavit is not a pleading and not subject to attack under Rule 12(f)), *Knight v. United States,* 845 F.Supp. 1372, 1374 (D.Ariz. 1993), *aff'd,* 77 F.3d 489 (9th Cir.), *cert. denied,* 519 U.S. 894, 117 S.Ct. 238, 136 L.Ed.2d 168 (1996) (motions to strike apply only to pleadings), and *International Longshoremen's Ass'n, Steamship Clerks Local 1624, AFL–CIO v. Virginia Int'l Terminals, Inc.,* 904 F.Supp. 500, 504 (E.D.Va.1995) (summary judgment briefs and affidavits are not pleadings; there-

process for having SDAC's decision reviewed in state court. Once suit was brought in this court, however, the state court proceedings were stayed.

6. Big Stone also claims that SDAC's decision imposes an undue burden on interstate commerce in violation of Article I, Section 8, of the United States Constitution. Because the decision on the issue of preemption effectively resolves the case, the court need not reach the issue of the Commerce Clause.

fore, a motion to strike is not a proper method for challenging such briefs and affidavits). *See generally* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1380 (1990). Accordingly, plaintiff's motion to strike the Taylor affidavit under Rule 12(f) should be denied.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. PREEMPTION

[¶ 13.] The doctrine of preemption is based on the Supremacy Clause of the Constitution, which provides that "[t]he Constitution and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. CONST. Art. VI, Cl. 2. As Chief Justice Marshall explained long ago, "in every case, the act of Congress, or the treaty is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824).

[¶ 14.] The issue of federal preemption is one of law for the court to decide. This court has previously discussed the standards in considering a claim of preemption in *Stanton v. State Farm Fire and Casualty Co., Inc.,* 78 F.Supp.2d 1029, 1031–32 (D.S.D.1999) (citing *Symens v. Smithkline Beecham Corp.,* 1997 DSD 29, 19 F.Supp.2d 1062 (D.S.D.1997), reversed, in part, on other grounds, by 152 F.3d 1050 (8th Cir.1998)):

> The United States Supreme Court has "recognized that the Supremacy Clause, U.S. Const., Art. VI, may entail preemption of state law either by express provision, by implication, or by a conflict between federal and state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995); *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct.

1483, 1487, 131 L.Ed.2d 385 (1995). The Eighth Circuit recognizes an additional method of preemption where the subject matter of the legislation concerns "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Heart of America Grain Inspection Service, Inc. v. Missouri Department of Agriculture,* 123 F.3d 1098, 1103, (8th Cir.1997) (citations omitted). The Eighth Circuit has characterized the exceptions as follows:

> Preemption traditionally comes in four "flavors": (1) "express preemption," resulting from an express Congressional directive ousting state law (*Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)); (2) "implied preemption," resulting from an inference that Congress intended to oust state law in order to achieve its objective (*Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)); (3) "conflict preemption," resulting from the operation of the Supremacy Clause when federal and state law actually conflict, even when Congress says nothing about it (*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963)); and (4) "field preemption," resulting from a determination that Congress intended to remove an entire area from state regulatory authority (*Fidelity Fed. Savs. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).

*Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dept. of Commerce,* 999 F.2d 354, 358 n. 3 (8th Cir.1993).

The ultimate touchstone of statutory preemption is congressional intent. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d

700 (1996); *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354, 357 (8th Cir. 1993). "In all preemption cases ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic v. Lohr*, 518 U.S. at 485, 116 S.Ct. at 2250 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). "The historic police powers of the State include the regulation of matters of health and safety." *De Buono v. NYSA–ILA Medical and Clinical Services Fund*, 520 U.S. 806, 814, 117 S.Ct. 1747, 1751, 138 L.Ed.2d 21 (1997), citing *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985). Defendant therefore "bears the considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'" *Id.* at 814, 117 S.Ct. at 1751 (quoting *Travelers*, 514 U.S. at 654, 115 S.Ct. at 1676).

[¶ 15.] At issue in this case is the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et. seq.*, and Part 77 of the FAA regulations governing "Objects Affecting Navigable Airspace," 14 C .F.R. § 77. The Act affirmatively states that the "United States Government has *exclusive* sovereignty of [the] airspace of the United States." 49 U.S.C. § 40103(a)(1) (emphasis added). In addition, the Act imposes upon the Administrator of the FAA the duty to prescribe regulations for—

(A) navigating, protecting, and identifying aircraft;

(B) protecting individuals and property on the ground;

(C) using the navigable airspace efficiently; and

(D) preventing collision between aircraft, between aircraft and land and wa-

ter vehicles, and between aircraft and airborne objects.

49 U.S.C. § 40103(b)(2). The Act also specifically recognizes the threat that tall structures can pose to air safety, directing that the FAA

shall require a person to give adequate public notice, in the form and way the Secretary prescribes, of the construction, alteration, establishment, or expansion, or the proposed construction, alteration, establishment, or expansion, of a structure ... when the notice will promote—

(1) safety in air commerce; and

(2) the efficient use and preservation of the navigable airspace ... [.]

49 U.S.C. § 44718(a)(1) & (2).

[¶ 16.] If the FAA determines that a proposed construction project could prove to be a threat to the navigable air space, the Act then demands that the FAA "conduct an aeronautical study to decide the extent of any adverse impact on the safe and efficient use of the airspace." 49 U.S.C. § 44718(b)(1). In conducting such a study, the FAA is to consider

(A) the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;

(B) the impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;

(C) the impact on existing public-use airports and aeronautical facilities;

(D) the impact on planned public-use airports and aeronautical facilities; and

(E) the cumulative impact resulting from the proposed construction or alteration of a structure when combined with the impact of other existing or proposed structures.

49 U.S.C. § 44718(b)(1).

[¶ 17.] Congress has also expressly addressed the need for the FAA and the

FCC to coordinate their mutual interests in the construction, location, and licensing of radio broadcast towers. The FCC, in determining whether to issue a construction permit, is required to consider, among other things, the location of the proposed tower and the type of transmitting apparatus to be used. 47 U.S.C. § 319(a). Such information is to be provided by the applicant in the application for the construction permit. *Id.* In reviewing such an application, the FCC must consult with the FAA. 49 U.S.C. § 44718(c). The agencies are to coordinate their efforts in considering the application for construction and the completion of any associated aeronautical study. *Id.*

[¶ 18.] Pursuant to these statutory powers, the FAA and FCC have promulgated detailed regulations. The FAA issued Part 77 of the Federal Aviation Regulations governing "Objects Affecting Navigable Airspace," 14 C.F.R. § 77. Part 77 establishes standards for determining obstructions in navigable airspace, sets forth the requirements for notice of certain proposed construction plans, provides aeronautical studies to determine the effect of any proposed construction on the safe and efficient use of airspace, and provides for public hearings on the hazardous effect of any proposed construction. In conducting an aeronautical study, the FAA will specifically consider the impact any proposed construction may have on VFR flight operations. 14 C.F.R. § 77.31(a).

[¶ 19.] The FCC, pursuant to its statutory authority, has promulgated Part 17 of the Federal Communications Regulations governing "Construction, Marking, and Lighting of Antenna Structures," 47 C.F.R. § 17. Under the regulations, the FCC is to determine whether any such structure constitutes a menace to air navigation. 47 C.F.R. § 17.1(a). In making such a determination, and before the FCC will approve any proposed construction, the FCC requires the owner of the antenna to provide notice to the FAA. 47 C .F.R. § 17.7. In the application for a construction permit, the FCC requires that the applicant "submit a valid FAA determination of 'no hazard.'" 47 C.F.R. § 17.4(b). Failure to provide the FCC with the FAA "no hazard" determination can delay the registration process or result in outright disapproval.[7] 47 C.F.R. § 17.4(d).

[¶ 20.] From the above examination and the undisputed facts in this case, it is clear to this court that Congress intended to remove the field of air space management, at least as to radio broadcast towers, from state regulatory authority. *See Fidelity Fed. Savs. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Congress has expressly declared that the federal government has exclusive sovereignty over the airspace of the United States. 49 U.S .C. § 40103(a)(1). As an exercise of its exclusive sovereignty, Congress has given the FAA the duty to determine what constitutes an efficient use of the airspace and what broadcast towers present hazards to

---

**7.** Defendants argue that the FAA "no hazard" determination, standing alone, is legally unenforceable, and is only advisory in nature. *See Aircraft Owners and Pilots Ass'n v. FAA,* 600 F.2d 965, 966 n. 2 (D.C.Cir.1979) (stating that the FAA "no hazard" determination is "technically advisory in nature"). Without getting into an analysis of the issue, it is clear that a "no hazard" determination has real importance to the FCC. As discussed above, an applicant's failure to provide the FCC with the FAA "no hazard" determination can delay the FCC registration process or result in outright disapproval. 47 C.F.R. § 17.4(d). Therefore, a "no hazard" determination was of upmost importance to Big Stone and the FCC, regardless of how other courts have categorized such determinations in other contexts.

air traffic. 49 U.S.C. § 40103(b)(2)(A) & (C). In addition, Congress has statutorily mandated that the FAA and FCC coordinate their efforts governing the placement, construction, and location of radio broadcast towers. 49 U.S.C. § 44718. Pursuant to that directive, both the FAA and FCC have promulgated detailed regulations. The regulations specifically relate to radio broadcast towers, 47 C.F.R. § 17, and expressly take into account the impact any proposed construction could have on VFR flight routes, 14 C.F.R. § 77.31(a). Thus, federal control is pervasive, and, more importantly, directly covers the proposed construction in this case.

■ [¶ 21.] The legislative history behind the Act further supports this court's conclusion that Congress intended to preempt the field of air traffic and safety in conjunction with radio broadcast towers. Congress's primary purpose in enacting the Act was the promotion of aviation safety. *See In re Mexico City Aircrash of October 31, 1979*, 708 F.2d 400, 406 (9th Cir.1983). "The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n v. Quesada*, 276 F.2d 892, 894 (2d Cir.1960). As the United States Court of Appeals for the Third Circuit observed, "[b]y enacting the FAA, Congress intended to rest sole responsibility for supervising the aviation industry with the federal government." *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 368 (3rd Cir.1999). As Congress stated when it passed the Act:

> [A]viation is unique among transportation industries in its relation to the federal government—it is the only one whose operations are conducted almost wholly within federal jurisdiction, and are subject to little or no regulation by States or local authorities. Thus, the federal government bears virtually complete responsibility for the promotion and supervision of this industry in the public interest.

S.Rep. No. 1811, 85th Cong., 2d Sess. 5 (1958). "Similarly, the House Report accompanying the FAA indicates that one of the purposes of the Act is to give '[t]he Administrator of the new [FAA] ... full responsibility and authority for the advancement and promulgation of civil aeronautics generally, including promulgation and enforcement of safety regulations.' " *Abdullah*, 181 F.3d at 368–69, quoting H.R.Rep. No. 2360, reprinted in 1958 U.S.C.C.A.N. 3741. The Third Circuit, after reviewing the legislative history of the Act, concluded that the "legislative history reveals that Congress intended the Administrator, on behalf of the Federal Aviation Administration, to exercise sole discretion in regulating air safety." *Abdullah*, 181 F.3d at 369. This court may well agree but intends to restrict the thrust of this opinion to the case involving a radio broadcast tower.

■ [¶ 22.] Long ago, before the FAA was even created, Justice Jackson, believing that the field of aviation should be subject to only one uniform system of safety standards, stated that the regulation of aviation is a "national responsibility" and that "[f]ederal control is intensive and exclusive." *Northwest Airlines v. Minnesota*, 322 U.S. 292, 303, 64 S.Ct. 950, 88 L.Ed. 1283 (1944) (Jackson, J., concurring). Most courts that have considered the preemptive force of the Act have agreed with Justice Jackson.[8] *See generally* 8A

---

8. In *Aeronautics Commission of Indiana v. State ex rel Emmis Broadcasting Corp.*, 440 N.E.2d 700 (Ind.App.1982), the court held that the FAA did not preempt the state's determination that a proposed tower constituted

Am Jur 2d, Aviation § 28 (collecting cases and stating that the federal regulation of airspace management and air safety is so pervasive that preemption is inferred). The United States Supreme Court, in analyzing the Act, held that Congress's consolidation of control of aviation in one agency indicated its intent to federally preempt aviation safety. *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 639, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). In reaching this decision, the Supreme Court first noted that the Solicitor General, although arguing against preemption in that case, conceded that airspace management was federally preempted. *Id.* at 627, 93 S.Ct. 1854. Finding this to be a "fatal concession," the Court went on to hold that the city's attempt to regulate noise was preempted by the Act. *Id.* at 627–28, 93 S.Ct. 1854. Dissenting, then Justice Rehnquist nonetheless agreed with the Court that "[t]he 1958 Act was intended to consolidate in one agency in the Executive Branch the control over aviation that had previously been diffused within that branch. The paramount substantive concerns of Congress were to regulate federally *all* aspects of air safety." *Id.* at 644, 93 S.Ct. 1854 (emphasis added).

[¶ 23.] Many lower courts considering the issue have reached a similar result.[9] *See, e.g., Abdullah*, 181 F.3d at 371 (finding that standards of care relating to air safety have been preempted), *Burbank–Glendale–Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338 (9th Cir. 1992) (holding that regulation conditioning construction on city approval of placement of runways was preempted), *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir.1989) (finding that the field of pilot regulation was preempted), *Pirolo v. City of Clearwater*, 711 F.2d 1006 (11th Cir. 1983) (holding that city ordinances regulating night operations and setting air traffic patterns were preempted), *Price v. Charter Township of Fenton*, 909 F.Supp. 498 (E.D.Mich.1995) (finding that township ordinance limiting the frequency of flights was preempted by the FAA), and *Blue Sky Entertainment v. Town of Gardiner*, 711 F.Supp. 678 (N.D.N.Y.1989) (stating that it "is well settled that FAA has been delegated exclusive responsibility by Congress for the safe and efficient management of the navigable airspace of the United States").

[¶ 24.] Also important to this court's conclusion that the Act preempts SDAC's actions in this case is the Supreme Court's discussion of the interaction between the FAA and Environmental Protection Agency (EPA) in *City of Burbank.* The Court discussed at great length the evolving statutory scheme surrounding the FAA and spent considerable time detailing the interactions between the FAA and EPA in their joint efforts to control airport noise. *City*

---

a threat to air traffic safety. The rationale of the decision, however, speaks very little about the issue of preemption. The court primarily based its conclusion on its opinion that, since the FAA had no power to enforce its "no hazard" determinations, Congress necessarily intended the states some room to act. However, as is discussed later, such reasoning goes to the remedy the court should employ, not to the agency that is charged with determining hazards to air safety in the first place. As discussed above, it is the FAA that enjoys that responsibility, and any state action inconsistent with the FAA is preempted. However, should the FAA and the state agree on an air

safety hazard, then the state is free, of course, to use its own enforcement procedures to ensure that the FAA's determination is honored. Thus, the state is free to act only when its proposed action is in accord with what the FAA has determined in an area in which federal preemption applies.

9. An important exception to the preemptive force of the FAA, not relevant here, permits local aircraft proprietors to regulate noise levels at their airports. *See, e.g., Global Int'l Airways Corp. v. Port Authority of New York and New Jersey*, 727 F.2d 246 (2nd Cir.1984).

*of Burbank,* 411 U.S. at 628–633, 93 S.Ct. 1854. The fact that two federal agencies have been directed by Congress to coordinate their efforts in addressing a common issue supported the Court's finding of preemption. The Court simply would not permit the states to interfere and diffuse the power Congress expressly gave to the FAA and EPA. *Id.* at 640, 93 S.Ct. 1854.

[¶ 25.] In this case, two federal agencies have been delegated the authority to jointly confront the problem that tall radio broadcast towers can pose to air traffic and safety. Both agencies, in response to their congressional charge, have promulgated detailed regulations ensuring cooperation and pursuing safety and efficiency in the management of America's air space. Permitting the states to diffuse that power and interfere with that cooperation would frustrate Congress's intent and erode the effectiveness of the FAA and FCC to jointly control the construction of tall and perhaps threatening radio broadcast towers. Just as the Supreme Court in *City of Burbank* was hesitant to let the state encroach on the cooperative authority Congress had granted to the FAA and EPA in the control of airport noise, this court will likewise not permit SDAC to inject itself, especially after-the-fact, into the process of determining the dangerousness of a proposed radio broadcast tower.[10] To do so would give the state a veto over both the FAA and FCC, render void the extensive cooperation between the FAA and FCC, and dilute their authority to determine hazards to air traffic and safety.

[¶ 26.] This case is a clear demonstration of those unwanted effects. The FAA and FCC, adhering to their statutory and regu-latory mandates, concluded that the proposed construction in this case presented no hazard to air traffic and safety. The state, by its contrary conclusion, in essence, vetoed the FAA's decision, and, in doing so, derailed the construction of a radio broadcast tower that the FCC had determined was in the public interest. This the state cannot do, especially in light of the fact that the basis for the state's decision, potential harm to VFR flight routes, had specifically been considered and studied by the FAA.

[¶ 27.] There is yet another important basis for the court's decision. The FAA, upon this court's invitation, submitted an *amicus curiae* brief to detail its position in this dispute. The FAA, after considering both the statutory and regulatory background of the Act, took the position that the Act occupies the field of air traffic and safety, and that SDAC's decision to disapprove the construction of the tower based on its conclusion that the tower would constitute a hazard to air navigation was, therefore, preempted.

[¶ 28.] Under the *Chevron* doctrine, the FAA's determination that the Act preempts the field is obviously important to this litigation. According to the *Chevron* doctrine, this court is to defer to an agency's reasonable interpretation of its statutory mandate. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Deference is required so long as the interpretation adopted by an agency charged with applying a statute is reasonable and not contrary to clearly expressed congressional intent. *See South-*

---

10. If SDAC wants its concerns about proposed construction to be heard, the FAA affords it that right. Under 14 C.F.R. § 77.35, the FAA, when conducting an aeronautical study, is to solicit comments from all interested persons and is to explore objections to the proposal. SDAC should have taken advantage of this procedure which would have afforded them an opportunity to have the FAA consider its concerns regarding the effect the proposed tower could have on the South Dakota trunk highway VFR program.

*western Bell Telephone Co. v. F.C.C.*, 153 F.3d 523, 535 (8th Cir.1998). As this court has independently concluded that the Act preempts the field of air traffic and safety under the facts of this case, the FAA's determination is, therefore, reasonable and not contrary to clearly expressed congressional intent. It is a reasonable conclusion, given the broad statutory framework of the Act, and is in harmony with the Supreme Court's *City of Burbank* decision.

[¶ 29.] Accordingly, this court will accept the FAA's reasonable interpretation and will defer to its conclusion that SDAC's actions in this case have been preempted. As discussed above, the court would arrive at such a conclusion regardless of the FAA's position, but given the FAA's interpretation, the court is confident that Congress did not intend to give the states veto power over FAA "no hazard" determinations.

[¶ 30.] Accordingly, because of the broad legislative scheme, the detailed regulations adopted pursuant to that scheme, the required cooperation and coordination between the FAA and FCC, the legislative history, case law, and the FAA's own interpretation, the court concludes that the Act and the regulations promulgated in connection with the Act, preempt the field of air traffic and safety as to radio broadcast towers, and, therefore, SDAC's decision to prohibit construction of the tower in this case is of no legal effect.

## B. REMEDY

[¶ 31.] Having determined that SDAC's actions in this case are preempted by federal law, a dispute remains concerning the appropriate remedy that should be issued. Big Stone seeks to have the entirety of SDCL Chapter 50–9 and all of ARSD Chapter 70:02:03 declared unconstitutional. The court, however, will not declare SDCL Chapter 50–9 to be unconstitutional.

[¶ 32.] SDCL Chapter 50–9 concerns air navigation hazards. Of particular importance to the issue of remedy is SDCL 50–9–9, which grants SDAC the right to seek injunctive relief in state courts to enforce its rules and determinations. Defendants contend that if SDCL Chapter 50–9 is struck down, SDAC will lose its authority to enforce its rules and regulations. This court agrees.

[¶ 33.] The issue of enforcement has some importance to this litigation. SDAC contends that the FAA has no power to enforce its "no hazard" determinations. As discussed above, the FCC, in situations like the instant case that concern radio broadcast towers, can enforce the FAA "no hazard" determination by staying or dismissing a FCC registration application. 47 C.F.R. § 17.4(d). One court has noted that "[o]nce issued, a hazard/no hazard determination has no enforceable legal effect." *Aircraft Owners and Pilots Ass'n v. FAA*, 600 F.2d 965, 966 (D.C.Cir.1979). The FAA's determination of "no hazard" "promotes air safety through 'moral suasion' by encouraging the voluntary cooperation of sponsors of potentially hazardous structures." *Id.* at 967, citing *Air Line Pilots' Ass'n Int'l, v. FAA*, 446 F.2d 236, 240 (5th Cir.1971). As this court reviewed the Act and relevant regulations, nothing could be found that confers upon the FAA the right to enforce its "no hazard" determinations. However, this court will not jump to the conclusion that the FAA has no authority to seek to enforce its own determinations. Various forms of relief could potentially be sought in federal court. However, that issue is not before the court and no further discussion is therefore warranted.

[¶ 34.] Defendants, having been given access to the courts by virtue of SDCL 50–9–9, argue that it is the entity that can enforce FAA "no hazard" determinations.

Indeed, the Indiana Court of Appeals, in a decision holding that the state was free to block the construction of towers the state determined to constitute hazards to air safety, notwithstanding a FAA determination to the contrary, rooted its rationale on this very issue. *Aeronautics Commission of Indiana v. State ex rel. Emmis Broadcasting Corp.*, 440 N.E.2d 700, 704 (Ind. App.1982). That court latched on to the legal enforcement issue and concluded that because the FAA has no such power and the state commission did, Congress must have intended to grant the states some room to act. *Id.* However, this rationale will not be adopted here as this court certainly is not going to conclude that the FAA has no power to seek judicial relief to enforce FAA determinations.

[¶ 35.] This court, however, will not disarm SDAC and prevent it from assisting in the enforcement of FAA determinations. Clearly, in many situations, both the FAA and SDAC will agree on whether a proposed construction plan will pose a hazard to air traffic and safety. In such situations, SDAC must be free to enforce such determinations.

[¶ 36.] Accordingly, this court will craft a more limited remedy. The court will only enjoin defendants from acting to prohibit the construction of proposed broadcast towers when the FAA, in adherence to its statutory and regulatory provisions, determines that the proposed tower poses no hazard to air traffic and safety. In essence, then, the court enjoins defendants and their successors from vetoing a FAA determination of "no hazard" in connection with radio broadcast towers.

### ORDER

[¶ 37.] Based upon the foregoing,

[¶ 38.] IT IS ORDERED:

1) Big Stone's motion to strike the affidavit of Harley F. Taylor, Doc. 49, is denied.

2) Defendants' motion for summary judgment, Doc. 43, is denied.

3) Big Stone's motion for summary judgment, Doc. 37, is granted, in part, as set forth above.

4) Defendants and their successors in office are permanently enjoined as set forth above.

5) The previous action of the South Dakota Aeronautics Commission in denying Big Stone's application is set aside and is without legal effect.