# IN THE SUPREME COURT OF IOWA

No. 17–1458

Filed May 10, 2019

**THE CARROLL AIRPORT COMMISSION,**

Appellee,

vs.

**LOREN W. DANNER** and **PAN DANNER,**

Appellants.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Carroll County, William C. Ostlund, Judge.

A farmer seeks further review of a court of appeals decision declining to give preemptive effect to a no-hazard determination by the Federal Aviation Administration. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED.**

Steven D. Hamilton of Hamilton Law Firm, P.C., Storm Lake, for appellants.

Gina C. Badding of Neu, Minnich, Comito, Halbur, Neu & Badding, P.C., Carroll, for appellee.

**WATERMAN, Justice.**

In this appeal, we must determine the legal effect of a "no hazard" letter issued by the Federal Aviation Administration (FAA) to a farmer who built a twelve-story grain leg (bucket elevator) near an airport. The structure intrudes sixty feet into airspace restricted for aviation. Construction was well underway when a member of the local airport commission cried foul. The airport commission informed the farmer he needed a variance and refused to grant one, without waiting for input from federal officials. Shortly thereafter, the FAA investigated and granted a no-hazard determination, approving the structure on the condition the farmer paint it and place blinking red lights on top, which he did. The FAA also adjusted the flight path. This did not satisfy the local commissioners, who two years later filed this action in equity to force the farmer to remove or modify the structure. The farmer raised an affirmative defense that the federal no-hazard determination preempted the local regulations.

The district court, sitting in equity, rejected the preemption defense and issued an injunction requiring the farmer to remove or alter the grain leg at his expense and imposed a daily penalty after a nine-month grace period to abate the nuisance. The farmer appealed, and we transferred the case to the court of appeals, which affirmed the rejection of his preemption defense. We granted the farmer's application for further review.

On our de novo review, we determine that the Federal Aviation Act allows for local zoning regulation, and the no-hazard letter did not preempt the local airport zoning regulations as a matter of law. We affirm the district court's finding the structure constitutes a threat to aviation requiring abatement. But we conclude that the $200 daily

penalty should be vacated, and the nine-month period to modify or remove the structure shall begin anew when procedendo issues. We affirm the district court judgment as modified.

## I. Background Facts and Proceedings.

Loren and Pan Danner, husband and wife, live on a farm they own in Carroll County, Iowa. Loren has been farming this land since 1968. Loren formerly raised livestock but has exclusively grown row crops on the land since 2000. The Danner farm sits under the flight path to the Arthur N. Neu Municipal Airport, a facility managed by the Carroll Airport Commission (the Commission). Local zoning ordinances mandate a protected zone around the airport that extends 10,000 feet horizontally from the end of Runways 13 and 31 into an arc 150 feet above the airport. The Danners' farm sits within this zone.

In 2009, after a particularly good harvest, Loren realized he needed to find a way to more efficiently dry and store harvested grain. He considered multiple options, but ultimately decided to construct a grain leg (also known as a bucket elevator) with attached storage bins. Loren and two farm neighbors built five grain-storage bins of varying sizes on the Danners' farmland. The five bins stand in a semicircle around the grain leg. The grain leg is a 127-foot-tall structure with separate metal tubes sloping down from its top to each storage bin.

The grain leg stands within 10,000 feet horizontally from the end of Runway 31. The top of the structure is 1413.43 feet above mean sea level. The protected airspace above the airport is 1354 feet above mean sea level. The structure reaches a height of 127 feet off the ground. The parties agree the grain leg intrudes within the airport's protected airspace by approximately sixty feet.

In January 2013, before beginning construction of the grain leg, Loren went to Carl Wilburn, the county zoning administrator, to obtain a building permit. Wilburn issued the building permit and granted the Danners an agricultural exemption from the county zoning ordinances. The agricultural exemption, however, did not exempt the Danners from the airport zoning ordinances. The building permit application states, "All farm buildings or structures are subject to the Airport Zoning Ordinances which regulate[] height and emissions in and around the airport air space as depicted on the attached diagram[.]" The diagram attached to the permit showed the airport's protected airspace. Despite this warning on the building permit application, neither the Danners nor Wilburn realized that the agricultural exemption did not exempt the grain leg from the airport zoning regulations. For that reason, the Commission was never notified of the Danners' application for a building permit, and the Danners failed to request a variance from the airport zoning ordinance. Construction of the grain leg began in April and was completed in August.

Meanwhile, in June, Commissioner Greg Siemann noticed the grain leg construction and became concerned. The next day, he contacted Wilburn and Greg Schreck, the city zoning commissioner. Wilburn informed Siemann that he had issued a building permit to the Danners with an agricultural exemption and acknowledged he was unaware of the local airport zoning restrictions.

The Commission notified the Danners that the grain leg required a variance from the airport zoning regulations and informed the Danners it would not consent to the violation of the regulations or grant a variance. The Commission asked the FAA to perform an aeronautical study of the grain leg and its impact on aviation safety.

In July, after performing the aeronautical study, the FAA issued a "DETERMINATION OF NO HAZARD TO AIR NAVIGATION" letter, stating in part, "This aeronautical study revealed that the structure does exceed obstruction standards but would not be a hazard to air navigation" if the Danners met certain conditions. The FAA instructed the Danners to paint the structure and add red lights to the top of it. The no-hazard letter warned the Danners,

> This determination concerns the effect of this structure on the safe and efficient use of navigable airspace by aircraft and does not relieve the sponsor of compliance responsibilities relating to any law, ordinance, or regulation of any Federal, State, or local government body.

The Commission did not seek judicial review of the no-hazard determination as permitted under federal law. *See* 14 C.F.R. §§ 77.37, .39, .41 (2013). The Danners complied with the FAA's instructions, adding lights and painting the grain leg. The FAA issued a "Notice to Airmen" (NOTAM) that raised the minimum descent levels for the airport by 100 feet, requiring pilots to approach the airport at a higher altitude.

Two years later, in July 2015, the Commission filed this action on the district court's equity docket alleging the grain leg violated certain building ordinances, city and county zoning ordinances, and airport commission regulations, and constituted a nuisance and hazard to air traffic. The Commission sought equitable relief—an injunction requiring the Danners to modify or remove the grain leg. The Danners filed an answer and jury demand. The Danners raised an affirmative defense of federal preemption. The district court struck the jury demand because the case was filed in equity. The case proceeded to a bench trial.

At trial, the following witnesses testified for the Commission: C. Peter Crawford, the engineer for the airport; John McLaughlin, a

meteorologist, pilot, and flight instructor; Donald Mensen, fixed base operator of the airport; Kevin Wittrock, a commissioner and a pilot; and Siemann, an attorney, pilot, and commissioner. Loren Danner testified on his own behalf. No pilot or aviation expert testified for the Danners.

Crawford testified about the engineering survey of the grain leg in relation to Runway 31 of the airport. The survey showed that the grain leg was 7718 feet from the end of Runway 31 and within the airport's protected zone.

The other witnesses gave opinion testimony that the grain leg constituted a hazard to aviation. The pilots testified about their experiences flying over the grain leg when landing at the airport and expressed their concerns for student pilots or pilots distracted while landing. The Commission also presented testimony that the grain leg would jeopardize the airport's ability to secure federal grant money. The record indicates, however, that the airport received two federal grants, one for $284,466 and another for $263,200, after the Danners installed the grain leg.

Loren testified that it cost approximately $274,928 to construct the grain leg, $32,942 to install a concrete drive-over pad, and $8000 for an electrical contractor. Loren testified that if the height of the grain leg was reduced, he could no longer rely on gravity to move the grain from the distributor to the storage bins. Instead, he would need to install conveyors. Loren estimated that the cost to tear down the grain leg and rebuild it with conveyors to each of the storage bins in compliance with the zoning regulations would be approximately $450,000. These cost figures went unchallenged.

In June 2017, the district court found that the grain leg violated state and local zoning ordinances and constituted a nuisance and an

airport hazard under Iowa Code sections 329.2 and 657.2(8) (2015). The court found that the grain leg did not fall within the agricultural exemption to certain zoning laws. The court rejected the Danners' affirmative defense that the no-hazard letter preempted state and local zoning laws, stating,

> While the FAA regulations certainly do apply, the local county regulations can also be in effect. The local regulations take a more stringent stance on what a hazard is and how it could affect the air space. If the FAA regulations contained all airport and safety regulations there would be no need for the State to designate zoning powers to the Commission. The Court finds that these regulations in fact work together and the FAA regulations and letter sent do not preempt the local regulations.

The district court gave no evidentiary weight to the FAA's aeronautical study and no-hazard determination. The district court ordered the Danners to either remove the grain leg or modify its height to comply with the local regulations regarding the airport's protected airspace. The Danners filed a motion for judgment notwithstanding the verdict and a motion for new trial in light of our ruling in *State v. Martinez*, 896 N.W.2d 737 (Iowa 2017) (addressing preemptive effect of federal immigration laws). The district court denied the Danners' motions.

The Commission moved pursuant to Iowa Rule of Civil Procedure 1.904(2) to enlarge the order to set a date certain for abatement and to impose a daily penalty after that date. On September 5, the district court, after conferring with counsel, set May 1, 2018, as the date by which the Danners had to remove the grain leg or lower it by sixty feet, with a $200 per diem penalty every day thereafter accruing against the Danners jointly and severally.

The Danners appealed. We transferred the case to the court of appeals. The court of appeals affirmed, concluding that the doctrines of

express, implied, and conflict preemption did not apply to the FAA no-hazard determination. The Danners filed an application for further review, which we granted.

## II. Standard of Review.

The parties disagree as to the standard of review. The Commission contends the case was tried as a law action because the trial court ruled on objections. The Danners contend the case was tried in equity. "Generally, our review of a decision by the district court following a bench trial depends upon the manner in which the case was tried to the court." *Collins Tr. v. Allamakee Cty. Bd. of Supervisors*, 599 N.W.2d 460, 463 (Iowa 1999). If the case is tried at law, our review is for correction of errors at law. *Id.* "Our review of cases tried in equity is de novo." *City of Eagle Grove v. Cahalan Invs., LLC*, 904 N.W.2d 552, 558 (Iowa 2017).

We conclude this case was tried in equity. The Commission filed the action in equity and sought only equitable relief—a permanent injunction. Notably, the district court struck the Danners' jury demand based on its ruling that this is an action in equity. Accordingly, our review is de novo. *Id.* "Nevertheless, we give weight to the factual findings of the district court, especially with respect to determinations of witness credibility." *Id.*

Preemption, however, is a question of federal law. *See Martinez*, 896 N.W.2d at 746–47; *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 75 (Iowa 2014) (reviewing principles of federal preemption). "We review the district court's legal conclusions for correction of errors at law." *Walnut Creek Townhome Ass'n v. Depositors Ins.*, 913 N.W.2d 80, 87 (Iowa 2018).

### III. Analysis.

We must decide whether the FAA's no-hazard determination for the Danners' grain leg preempts state and local zoning ordinances limiting the height of structures in or near flight paths. The Danners rely on *Martinez*, contending our recent acknowledgment of the supremacy and sweeping preemptive effect of federal immigration law in that case supports preemption under federal aviation law here. In *Martinez*, we held federal immigration law preempted the state criminal prosecution of an undocumented worker for using false identity papers to gain employment. 896 N.W.2d at 757.[1] Federal immigration and aviation law alike can supersede conflicting local regulations. At first glance, the Danners have more to argue in favor of preemption than Martha Aracely Martinez, who lacked a specific finding in her favor by federal authorities. By contrast, the FAA specifically investigated the Danners' grain leg and issued a no-hazard determination (subject to conditions, which they satisfied). Federal aviation law, however, allows room for local zoning regulation. In our view, *Martinez* is not controlling here, and we will focus our analysis on aviation law and court decisions addressing the legal effect of FAA no-hazard determinations.

We first address the Federal Aviation Act and the federal regulations promulgated to implement the Act's safety standards. We next address Iowa state and local laws regulating structures near airports. We conclude federal law and the FAA no-hazard determination allow for local regulation of tall structures in flight paths, and the district court correctly rejected the Danner's preemption defense.

---

[1]The United States Supreme Court granted certiorari in another case addressing the preemptive effect of immigration law on state criminal prosecutions for identity theft. *State v. Garcia*, 401 P.3d 588, 599–600 (Kan. 2017), *cert. granted in part*, 139 S. Ct. 1317 (2019).

### A. Federal Law.

1. *The Federal Aviation Act.* The Federal Aviation Act of 1958,[2] codified as amended at 49 U.S.C. Subtit. VII, was created "for the purpose of centralizing in a single authority . . . the power to frame rules for the safe and efficient use of the nation's airspace." *Air Line Pilots Ass'n, Int'l v. Quesada,* 276 F.2d 892, 894 (2d Cir. 1960). Pursuant to the Act, "[t]he United States Government has exclusive sovereignty of airspace of the United States." 49 U.S.C. § 40103(a)(1) (2017).

> The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace.

*Id.* § 40103(b)(1).

The Administrator "shall promote safe flight of civil aircraft in air commerce by prescribing . . . regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security." *Id.* § 44701(a)(5). These safety standards apply to airports such as the Arthur N. Neu Municipal Airport. *Id.* § 44701(b). The Administrator is directed to carry out the safety regulation "chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation." *Id.* § 44701(c).

As one aspect of airport and aircraft safety, the Act regulates the construction of structures that interfere with airspace. This includes prescribing notice requirements for individuals who seek to build or expand a structure. *Id.* § 44718(a). The Act provides for aeronautical

---

[2]Both the Federal Aviation Administration and the Federal Aviation Act are referred to as the FAA. In this opinion, we refer to the Federal Aviation Administration as the FAA and the Federal Aviation Act as the "Aviation Act" or "the Act."

studies to determine the impact of the proposed construction. *Id.* § 44718(b). During an aeronautical study, the Secretary of Transportation must

> (A) consider factors relevant to the efficient and effective use of the navigable airspace, including—
>
> > (i) the impact on arrival, departure, and en route procedures for aircraft operating under visual flight rules;
> >
> > (ii) the impact on arrival, departure, and en route procedures for aircraft operating under instrument flight rules;
> >
> > (iii) the impact on existing public-use airports and aeronautical facilities;
> >
> > (iv) the impact on planned public-use airports and aeronautical facilities;
> >
> > (v) the cumulative impact resulting from the proposed construction or alteration of a structure when combined with the impact of other existing or proposed structures; and
> >
> > (vi) other factors relevant to the efficient and effective use of navigable airspace[.]

*Id.* § 44718(b)(1)(A)(i)–(vi). To implement the Act's requirements, Congress empowered the FAA to promulgate regulations. *Id.* § 40103(b).

2. *The federal regulations.* Title 14, part 77 of the Code of Federal Regulations sets forth notice requirements for proposed construction, guidance on determining whether proposed construction or an existing structure is an obstruction to air navigation, the aeronautical study and hazard/no-hazard determination process, and the procedure for petitions for review of such determinations. 14 C.F.R. § 77.1 (2018).

The regulations state that obstructions are presumed to be airport hazards unless an aeronautical study determines otherwise. *Id.* § 77.15(b). The FAA uses the safety regulations, as well as FAA policy and guidance materials, to determine whether an obstruction is an

airport hazard. *Id.*; *see also id.* § 77.25(c) (noting that obstruction standards may be supplemented by other guidance).

The regulations provide certain height safety standards. The surfaces used to determine height safety requirements include "an initial approach segment, a departure area, and a circling approach area," as well as "[t]he surface of a takeoff and landing area" of an airport. *Id.* § 77.17(a). The regulations also establish certain "imaginary surfaces" in relation to the runways of an airport, which create imaginary arcs within which an object may be an airport hazard. *Id.* § 77.19. The size of the imaginary surface depends upon the type of runway and the types of approaches a pilot can make on the runway. *Id.* The arcs are all 150 feet above the airport elevation, and the radius is either 5000 or 10,000 feet depending on the type of runway. *Id.* § 77.19(a).

If the FAA conducts an aeronautical study to determine whether an object is an airport hazard, it will evaluate the following in addition to the factors set out in 42 U.S.C. § 44718(b)(1),

> (4) Airport traffic capacity of existing public use airports and public use airport development plans received before the issuance of the final determination;

> (5) Minimum obstacle clearance altitudes, minimum instrument flight rules altitudes, approved or planned instrument approach procedures, and departure procedures;

> (6) The potential effect on ATC radar, direction finders, ATC tower line-of-sight visibility, and physical or electromagnetic effects on air navigation, communication facilities, and other surveillance systems;

> (7) The aeronautical effects resulting from the cumulative impact of a proposed construction or alteration of a structure when combined with the effects of other existing or proposed structures.

14 C.F.R. § 77.29(a); *see also id.* § 77.25(b).

After an aeronautical study, the FAA makes an initial hazard/no-hazard determination. *Id.* § 77.31. Pursuant to the regulations,

[a] Determination of No Hazard to Air Navigation will be issued when the aeronautical study concludes that the proposed construction or alteration will exceed an obstruction standard but would not have a substantial aeronautical impact to air navigation. A Determination of No Hazard to Air Navigation may include the following:

(1) Conditional provisions of a determination.

(2) Limitations necessary to minimize potential problems, such as the use of temporary construction equipment.

(3) Supplemental notice requirements, when required.

(4) Marking and lighting recommendations, as appropriate.

*Id.* § 77.31(d). The no-hazard determination will expire eighteen months after its effective date. *Id.* § 77.33(b).

The regulations provide a procedure to petition the FAA to reconsider or revise the determination, provided that construction has not begun and the petition is submitted at least fifteen days before the determination expires. *Id.* § 77.35(a). This determination will become final unless the FAA grants discretionary review. *Id.* § 77.37, .39 (discussing the procedure for discretionary review). An individual seeking discretionary review must do so within thirty days of the date of the determination. *Id.* § 77.39(a).

The no-hazard determination is reviewable as a final agency disposition. *Aircraft Owners & Pilots Ass'n v. FAA*, 600 F.2d 965, 966 n.2 (D.C. Cir. 1979). FAA no-hazard determinations have been successfully challenged under federal judicial review. *See, e.g.*, *Town of Barnstable v. FAA*, 659 F.3d 28, 35–36 (D.C. Cir. 2011) (vacating FAA no-hazard determination for off-shore wind farm); *Clark County v. FAA*, 522 F.3d 437, 443 (D.C. Cir. 2008) (vacating FAA no-hazard determination for wind farm near Las Vegas airport).

In *Aircraft Owners & Pilots Ass'n*, the United States Court of Appeals for the District of Columbia discussed the limited legal effect of a hazard/no-hazard determination:

> Once issued, a hazard/no-hazard determination has no enforceable legal effect. The FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation. Nevertheless, the ruling has substantial practical impact. The Federal Communications Commission, for example, considers the FAA's classification in granting permits for the construction of broadcast towers. The ruling may also affect the ability of a sponsor proposing construction to acquire insurance or to secure financing. Primarily, however, the determination promotes air safety through "moral suasion" by encouraging the voluntary cooperation of sponsors of potentially hazardous structures.

600 F.2d at 966–67 (footnotes omitted) (citation omitted).

"Nonetheless, a hazard determination can hinder the project sponsor in acquiring insurance, securing financing or obtaining approval from state or local authorities." *BFI Waste Sys. of N. Am., Inc. v. FAA*, 293 F.3d 527, 530 (D.C. Cir. 2002); *see also White Indus., Inc. v. FAA*, 692 F.2d 532, 533 n.1 (8th Cir. 1982) ("Although the FAA determination has no enforceable legal effect, it does have substantial practical impact as the Federal Communications Commission considers the determination in making its decisions with respect to proposed construction.").

**B. Iowa Law.** The State of Iowa and Carroll County each have enactments addressing airport hazards. Any city or county with an airport may establish an airport commission to manage and control the airport. Iowa Code § 330.17(1). These commissions have "all of the powers in relation to airports granted to cities and counties under state law, except powers to sell the airport." *Id.* § 330.21. These powers include the authority to make decisions with regard to zoning to prevent airport hazards. *Id.* §§ 329.2–.3. "In the event of any conflict between

any airport zoning regulations adopted or established under this chapter and any other regulations applicable to the same area, . . . the more stringent limitation or requirement shall govern and prevail." *Id.* § 329.8.

The Iowa Code defines an airport hazard as

> any structure or tree or use of land which would exceed the federal obstruction standards as contained in 14 C.F.R. § 77.21, 77.23 and 77.25 as revised March 4, 1972, and which obstruct the air space required for the flight of aircraft and landing or take-off at an airport or is otherwise hazardous to such landing or taking off of aircraft.

*Id.* § 329.1(2).

With regard to airport hazards, section 329.2 states,

> It is hereby found that an airport hazard endangers the lives and property of users of the airport and of occupants of land and other persons in its vicinity, and also, if of the obstruction type, in effect reduces the size of the area available for the landing, taking off and maneuvering of aircraft, thus tending to destroy or impair the utility of the airport and the public investment therein. Accordingly, it is hereby declared:
>
> 1. That the creation or establishment of an airport hazard is a public nuisance and an injury to the community served by the airport in question.
>
> 2. That it is necessary in the interest of public health, safety, and general welfare that the creation or establishment of airport hazards be prevented.
>
> 3. That this should be accomplished, to the extent legally possible, by proper exercise of the police power.
>
> 4. That the prevention of the creation or establishment of airport hazards, and the elimination, removal, alteration, mitigation, or marking and lighting of existing airport hazards are public purposes for which municipalities may raise and expend public funds, as an incident to the operation of airports, to acquire land or property interests therein.

*Id.*

If an airport hazard exists, the Commission "may maintain actions in equity to restrain and abate as nuisances the creation or

establishment of airport hazards appertaining to said airport, in violation of any zoning regulations adopted or established pursuant to the provisions of this chapter." *Id.* § 329.5; *see also id.* § 657.2(8) ("Any object or structure hereafter erected within one thousand feet of the limits of any municipal or regularly established airport or landing place, which may endanger or obstruct aerial navigation, including take-off and landing, unless such object or structure constitutes a proper use or enjoyment of the land on which the same is located.").

The Code provides a procedure for applying for a variance to zoning laws. *Id.* § 329.11. A variance

> shall be allowed where a literal application or enforcement of the regulations would result in practical difficulty or unnecessary hardship and the relief granted would not be contrary to the public interest, but would do substantial justice and be in accordance with the spirit of the regulations and this chapter; provided, however, that any such variance may be allowed subject to any reasonable conditions that the board of adjustment may deem necessary to effectuate the purposes of this chapter.

*Id.*

The Carroll County ordinances state with regard to placement of towers and antennas, "All tower height allowances outlined in the preceding sections are subject to approval from the municipal Airport Commission." Carroll County, Iowa, Code of Ordinances § 14.15.040.02.7 (2017) (emphasis omitted); *see also id.* § 14.16.010.04 ("All structures with a height greater than 30 feet shall be reviewed by the Carroll Airport Commission."). An applicant for a building permit must file an application with the county zoning administrator, including "[d]ocumentation that the proposed tower site and height have been approved by the appropriate Airport Commission." *Id.* § 14.15.040.03.5 (emphasis omitted).

The county board of adjustment, in compliance with Iowa Code section 355.12, is permitted to hear cases regarding "[v]ariances to zoning district requirements where there are unusual conditions or circumstances that cause a hardship when the provisions of zoning are strictly applied." *Id.* § 14.18.010.07.3.

> The board shall reject any such application or appeal that is not filed within (10) days of the Zoning Administrator's decision. Also, the secretary shall reject any such application or appeal unless the same are made on prescribed forms properly filled out, with all required data attached.

*Id.* § 14.18.010.08.4.

> The airport zoning regulations define an airport hazard as
>
> any structure or tree or use of land that would exceed the Federal obstruction standards as contained in 14 CFR 77.21, 77.23, and 77.25, and that obstructs the airspace required for the flight of aircraft and landing or takeoff at an airport or is otherwise hazardous to such landing or taking off of aircraft.

*Id.* § 171.01(3).

The county airport zoning regulations establish "imaginary surfaces" as required by the federal regulations, creating a protected zone encompassing,

> 1. Horizontal Zone. The land lying under a horizontal plane 150 feet above the established elevations, the perimeter of which is constructed by swinging arcs of 10,000 feet radii from the center of each end of the primary surface of Runways 13 and 31, and 5,000 feet for Runways 3 and 21, and connecting the adjacent arcs by lines tangent to those arcs. No structure shall exceed 150 feet above the established airport elevation in the horizontal zone, as depicted on the Arthur N. Neu Municipal Airport Height Zoning Map.

*Id.* § 171.02(1).

The regulations also state,

> 5. Increase in Elevation of Structures. No structure shall be erected in the County that raises the published minimum descent altitude for an instrument approach to any runway, nor shall any structure be erected that causes the minimum obstruction clearance altitude or minimum en route altitude to be increased on any Federal airway in the County.

*Id.* § 171.02(5).

A landowner may request a variance from these regulations by applying to the board of adjustment and submitting a copy of the application to the Commission. *Id.* § 171.05. The Commission is permitted to give its opinion on the aeronautical effects of a possible variance within fifteen days of receiving its copy of the application. *Id.*

The airport regulations state, similar to the Iowa Code, that with regard to conflicting regulations the more stringent requirement prevails:

> Where there exists a conflict between any of the regulations or limitations prescribed in this chapter and any other regulations applicable to the same area, whether the conflict is with respect to height of structures, the use of land, or any other matter, the more stringent limitation or requirement shall govern and prevail.

*Id.* § 171.10.

**C. Application of Preemption Principles.** The Danners argue that the FAA no-hazard determination for their grain leg preempts a contrary determination by the Commission. The Danners contend that allowing local airports to determine what constitutes an airport hazard would impermissibly alter the federal standards. The district court and court of appeals disagreed and determined that federal law allows for overlapping local regulation of hazards. We agree that local regulation of tall structures near flight paths is recognized under federal aviation law.

Under the Supremacy Clause of the United States Constitution, "the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

> Consideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress."

*Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 366 (3d Cir. 1999) (alterations in original) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617 (1992)).

> [T]he Supremacy Clause has been interpreted to mean that even if a state statute is enacted in the execution of acknowledged state powers, state laws that "interfere with, or are contrary to the laws of Congress" must yield to federal law.

*Martinez*, 896 N.W.2d at 746 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 211, 9 Wheat. 1, 82 (1824)). The Supremacy Clause is implemented through the preemption doctrine. *Id.*

We have recognized "[t]here is a presumption against preemption which counsels a narrow construction of preemption provisions." *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 363 (Iowa 2014) (alteration in original) (quoting *Ackerman v. Am. Cyanamid Co.*, 586 N.W.2d 208, 213 (Iowa 1998)); *see also Freeman*, 848 N.W.2d at 83 (discussing "cooperative federalism" under which the federal law sets a floor, not a ceiling, and states may impose more stringent protections). That is what we have here under aviation laws regulating the height of structures in flight paths, as we explain below.

There are two broad categories of preemption, express and implied. *Martinez*, 896 N.W.2d at 746. Within implied preemption there are two

subcategories, conflict preemption and field preemption. *Id.* We will address express preemption, conflict preemption, and field preemption in turn.

1. *Express preemption.* "Express preemption occurs when the federal statutory text clearly provides that congressional authority is exclusive." *Id.* Express preemption requires examining the statutory language to determine the legislature's intent. *Id.*

Although the Aviation Act states that "[t]he United States Government has exclusive sovereignty of airspace of the United States," 49 U.S.C. § 40103(a)(1), there is no clear statutory text that Congress intended to make the FAA's authority under the Aviation Act exclusive as to restrictions on structures near airports. We agree with the court of appeals that the Aviation Act does not *expressly* preempt the state statutes and local ordinances at issue here.

2. *Conflict preemption.* "Conflict preemption occurs when a state law conflicts with a federal provision." *Martinez*, 896 N.W.2d at 747. "Conflict preemption occurs when 'compliance with both federal and state regulation is a physical impossibility.'" *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S. Ct. 1210, 1217 (1963)). "Conflict preemption also is imminent whenever two separate remedies are brought to bear on the same activity." *Id.* "Conflict preemption also occurs when a state law is an obstacle to the accomplishment of a federal purpose." *Id.* "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294 (2000)).

The district court concluded that both the federal and local regulations could be in effect and regulate airport hazards without conflict. The district court concluded the Aviation Act did not preempt the local regulations stating,

> The local regulations take a more stringent stance on what a hazard is and how it could affect the air space. If the FAA regulations contained all airport and safety regulations there would be no need for the State to designate zoning powers to the Commission.

The court of appeals determined the doctrine of conflict preemption did not apply because compliance with both statutes was not impossible. Because the state regulations impose a greater burden, it is possible to comply with both the state and federal regulations. This is supported, the court determined, by the statement in the no-hazard determination that "[t]his determination . . . does not relieve [the Danners] of compliance responsibilities relating to any law, ordinance, or regulation by any Federal, State, or local government body."

It is possible to comply with the federal, state, and local laws without conflict. We agree with the district court and court of appeals that the doctrine of conflict preemption does not apply in this case.

3. *Field preemption.* "Field preemption arises when Congress has enacted a comprehensive scheme." *Id.* at 746. In cases of field preemption,

> congressional intent to preempt can be inferred from a framework of regulation "so pervasive . . . that Congress left no room for the States to supplement it" or where there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."

*Id.* at 746–47 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947)).

"[C]oncluding that Congress intended to occupy the field of air safety does not end our task." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n,* 634 F.3d 206, 210 (2d Cir. 2011). "The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted[.]" *Id.* at 211 (alteration in original) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 107, 112 S. Ct. 2374, 2387 (1992)).

A variety of state and local laws have been preempted by the Aviation Act, including tort law,[3] state regulation of air travel,[4] and noise regulations.[5]    However, in *Goodspeed Airport,* the environmental

---

[3] *See, e.g., Montalvo v. Spirit Airlines,* 508 F.3d 464, 468 (9th Cir. 2007) (holding that the Aviation Act preempted state law duty-to-warn claims for passengers who developed deep vein thrombosis on domestic flights); *Abdullah,* 181 F.3d at 371–72 (holding that air safety standards as they relate to a standard of care for state negligence claims were preempted); *In re Sept. 11 Litig.,* 811 F. Supp. 2d 883, 891 (S.D.N.Y. 2011) (finding that federal law preempted state law with regard to the standard of care applicable to the defendant's conduct in allowing terrorists to hijack and crash a plane, noting that if state law controlled "air carriers then would be subjected to an untenable mixture of 50 different state legal regimes, and not to a uniform federal legal regime"); *In re Air Crash Near Clarence Ctr., N.Y., on Feb. 12, 2009,* 798 F. Supp. 2d 481, 486 (W.D.N.Y. 2011) (finding that the FAA preempted state law negligence standard of care).  *But see Sikkelee v. Precision Airmotive Corp.,* 822 F.3d 680, 683 (3d Cir. 2016) (holding that the FAA did not preempt design defect claims).

[4] *See, e.g., U.S. Airways, Inc. v. O'Donnell,* 627 F.3d 1318, 1329 (10th Cir. 2010) ("Based on the pervasive federal regulations concerning flight attendant and crew member training and the aviation safety concerns involved when regulating an airline's alcoholic beverage service, we conclude that [the state liquor law's] application to an airline implicates the field of airline safety that Congress intended federal law to regulate exclusively.  Thus, New Mexico's regulatory efforts are impliedly preempted."); *Air Transp. Ass'n of Am., Inc. v. Cuomo,* 520 F.3d 218, 219 (2d Cir. 2008) (per curiam) (finding that federal law preempted a state law establishing a passenger's bill of rights); *French v. Pan Am Express, Inc.,* 869 F.2d 1, 1 (1st Cir. 1989) (holding that pilot regulation statute was preempted).

[5] *See, e.g., City of Burbank v. Lockheed Air Terminal Inc.,* 411 U.S. 624, 638–40, 93 S. Ct. 1854, 1862–63 (1973) (concluding that the Aviation Act preempted a city ordinance attempting to control noise by prohibiting aircraft from taking off between 11 p.m. and 7 a.m.); *Burbank-Glendale-Pasadena Airport Auth. v. City of Los Angeles,* 979 F.2d 1338, 1341 (9th Cir. 1992) (finding that local regulations regarding airport noise were preempted).

regulation at issue—requiring a permit to cut down trees on wetlands—was not preempted because it did not sufficiently interfere with the federal regulations. *Id.* at 212. The court declined to determine

> whether the FAA Regulations would preempt the state and local laws, regulations, and actions challenged here if the trees were declared hazards and their removal ordered by the FAA. Significantly, in this case the federal government renounced any intention—indeed, questioned whether it had the authority—to declare the trees hazards and/or order their removal.

*Id.* at 208 n.1.

Courts have found ample room for state and local regulation. *See, e.g., City of Cleveland v. City of Brook Park*, 893 F. Supp. 742, 751 (N.D. Ohio 1995) ("While it is certainly true that runway placement will have some tangential effect on flight operations, the question of whether and where to construct a runway does not substantially affect the use of airspace. . . . The Federal Aviation Act does not occupy the field of land use regulations in such a way so as to preempt Brook Park's ordinances.").

The court of appeals concluded the doctrine of field preemption did not apply because the Act only sets minimum standards and implies that another body may lawfully impose more stringent standards. The court also noted that the FAA did not intend for the no-hazard determination to supersede state and local law because it has no enforceable legal effect. We agree for the reasons explained below.

4. *Cases addressing the preemptive effect of FAA no-hazard determinations for tall structures in flight paths.* We now turn to the several cases specifically adjudicating whether FAA no-hazard determinations preempt local regulation of the height of structures in flight paths.

The Commission relies on *Commonwealth v. Rogers*, an appeal by a business owner found guilty of violating a state statute by erecting a ninety-five-foot-tall sign that encroached on an airport's approach area, without seeking prior approval from the Pennsylvania Department of Transportation.  634 A.2d 245, 246–47 (Pa. Super. Ct. 1993).  The *Rogers* court, citing to *Aircraft Owners & Pilots Ass'n,* concluded that because FAA hazard/no-hazard determinations had no enforceable legal effect, the ability to prohibit or limit proposed construction because of the hazard it poses to air navigation "has been left to the states."  *Id.* at 250.  The *Rogers* court concluded, "Thus, although Congress has concerned itself with the hazards posed by tall structures, it has left untouched the legal enforcement of standards, which are peculiarly adapted to local regulation.  Therefore, the states may legislate concerning such matters."  *Id.*  The court noted that "[b]y enacting [the state statute], the legislature empowered [the department of transportation] to enforce mandatory compliance with FAA regulations which are designed to identify potential hazards to air navigation."  *Id.* at 253.  "Unlike the determination made by the FAA, [the department of transportation's] determination is enforceable, rather than advisory."  *Id.* "In order to ensure that landowners will comply with the requirement of prior approval by [the department of transportation], the legislature has mandated that the failure to seek approval is a summary offense."  *Id.* The court concluded this was a proper exercise of police power, and "[i]n this manner, [the department of transportation] can ensure that the safety regulations promulgated by the FAA are applied uniformly throughout the Commonwealth to establish a minimum threshold of safety, irrespective of different standards which may be adopted at the local level."  *Id.*  *Rogers* is distinguishable, however, because the

defendant had not actually received an FAA no-hazard determination as to the tall sign at issue.

In *La Salle National Bank v. Cook County*, a developer sought to construct eight-story apartment buildings near a naval air base. 340 N.E.2d 79, 81–82 (Ill. App. Ct. 1975). The developer relied on "a letter it received from the FAA indicating the proposed construction did not violate the height restrictions imposed by FAA on buildings in military airport approach zones." *Id.* at 83. County zoning officials nevertheless denied a required zoning reclassification based on local zoning height restrictions and pilot testimony that the buildings would pose a hazard. *Id.* at 81, 83–84. The appellate court, concluding that the local standards did not impede aviation, affirmed the rejection of the developer's federal preemption claim. *Id.* at 87–88. Similarly, here, the Commission's pilot witnesses testified the grain leg posed a hazard to aviation.

The Commission also relies on *Aeronautics Commission of Indiana v. State ex rel. Emmis Broadcasting Corp.*, 440 N.E.2d 700 (Ind. Ct. App. 1982). There, business owners sought to purchase the assets of a radio station but wanted to move the broadcast tower. *Id.* at 701–02. The prospective purchaser was required to coordinate with the Federal Communications Commission, "vested with authority to regulate the proposed construction and maintenance of broadcast towers[,]" as well as the FAA, vested with the authority to determine "whether a proposed antenna presents a hazard to air navigation." *Id.* at 702 & n.2. The FAA performed an aeronautical study and determined the antenna and tower would not be a hazard to air navigation. *Id.* at 702. However, the aeronautics commission advised the purchaser that it must also obtain a permit pursuant to the Indiana High Structures Safety Act before

constructing the tower. *Id.* The aeronautics commission denied the company's application for a permit. *Id.* The Indiana Court of Appeals, relying on *Aircraft Owners & Pilots Ass'n,* concluded that state and local regulations regarding tall structures were not preempted by the Aviation Act. *Id.* at 704–06. The court determined that

> Congress has concerned itself with the potential hazards for air safety created by tall structures, but it has purposely left untouched a distinctive part of the subject—the legal enforcement of standards—peculiarly adapted to local regulation; thus the state may legislate concerning such local matters which Congress could have covered but did not.

*Id.* at 706.

On the other hand, a federal district court expressly declined to follow *Aeronautics Commission of Indiana* and, instead, held that the FAA's no-hazard determination as to placement of a broadcast tower trumped a contrary local regulatory decision. *Big Stone Broad., Inc. v. Lindbloom,* 161 F. Supp. 2d 1009, 1021 (D.S.D. 2001). There, a radio broadcaster sued members of the South Dakota Aeronautics Commission (SDAC) for injunctive and declaratory relief, challenging the SDAC's denial of a permit to place an 875-foot broadcast tower near a state road used as a flight path for small aircraft. *Id.* at 1011–13. The FAA had issued a no-hazard determination for the tower in that location. *Id.* The *Big Stone* court noted the Indiana Court of Appeals "rooted its rationale" in the FAA's lack of power to compel a state regulator to allow construction of a tower the state deemed hazardous to aviation "notwithstanding a[n] FAA determination to the contrary." *Id.* at 1020–21. The *Big Stone* court "craft[ed] a more limited remedy" by enjoining the SDAC

> from acting to prohibit the construction of proposed broadcast towers when the FAA, in adherence to its statutory

and regulatory provisions, determines that the proposed tower poses no hazard to air traffic and safety. In essence, then, the court enjoins [the SDAC] from vetoing a[n] FAA determination of "no hazard" in connection with radio broadcast towers.

*Id.* at 1021. *Big Stone* has not been followed by other courts. It is also distinguishable. Here, we are reviewing a judgment on a bench trial determining the grain leg is hazardous to aviation and violates local zoning requirements, rather than a district court ruling accommodating competing federal and state agency decisions. And, unlike *Big Stone*, the Commission was not really "vetoing" the FAA's no-hazard determination because the no-hazard letter itself admonished the Danners that they remained subject to local zoning requirements.

In *Davidson County Broadcasting, Inc. v. Rowan County Board of Commissioners*, the North Carolina Court of Appeals considered whether a county was preempted from regulating air safety. 649 S.E.2d 904, 907 (N.C. Ct. App. 2007). In that case, a broadcasting company applied for a conditional use permit to construct a 1350-foot radio tower near a private airport. *Id.* at 907–08. After a public hearing, the county board of commissioners denied the permit, finding that the tower would penetrate air traffic patterns at the private airport and would constitute "hazardous safety conditions" in violation of the county zoning code. *Id.* The board reached this decision despite a no-hazard determination from the FAA. *Id.* However, the board noted, "[T]he FAA's review included only flight operations to and from public airports. Miller Airpark is a private airport to which the FAA regulations do not apply." *Id.* at 908. The court found no conflict between the Act and the county zoning law. *Id.* at 911. The court based this conclusion on the language in the no-hazard letter stating that the no-hazard letter "does not relieve the sponsor of compliance responsibilities relating to any law, ordinance, or

regulation of any Federal, State, or local government body." *Id.* The same language is found in the FAA's no-hazard letter for the Danners' grain leg.

On balance, we decline to hold the FAA no-hazard determination preempted enforcement of local zoning requirements. We reiterate that "[t]here is a presumption against preemption." *Huck*, 850 N.W.2d at 363 (alteration in original) (quoting *Ackerman*, 586 N.W.2d at 213). Federal courts recognize that the FAA's "hazard/no-hazard determination has no enforceable legal effect" and "[t]he FAA is not empowered to prohibit or limit proposed construction it deems dangerous to air navigation." *Aircraft Owners & Pilots Ass'n*, 600 F.2d at 966–67. Accordingly, that role must fall to state and local government, indicating Congress left room for "cooperative federalism." *See Freeman*, 848 N.W.2d at 83. In our view, the better reasoned authorities discussed above hold state and local regulators can impose stricter height restrictions on structures in flight paths notwithstanding an FAA no-hazard determination. Finally, we rely on the very language of this specific no-hazard determination, which expressly warned the Danners that they still must comply with state and local laws.

**D. Whether the District Court's Injunctive Relief Should Be Affirmed.** On June 16, 2017, the district court sustained the Commission's petition for abatement, finding the grain leg was an airport hazard constituting a nuisance. The district court ordered the grain leg to be removed or reconstructed at a lower height. The Danners filed a motion for judgment notwithstanding the verdict or for new trial, arguing federal preemption based on our holding in *Martinez*. The Commission filed a motion to set a date by which the grain leg had to be removed and

to impose a per diem penalty for each day after the deadline the grain leg continued to stand.

The court rejected the Danners' preemption defense based on *Martinez* and denied their motion for judgment notwithstanding the verdict. The court set a May 1, 2018 removal or modification deadline and, relying on Iowa Code section 329.14, imposed a $200 per day penalty commencing May 1, 2018, for each day the nuisance continued to stand unabated. That penalty has continued to accrue during this appeal at an annual rate of $73,000. On our de novo review, we affirm the nuisance determination and remedy except that we vacate the per diem penalty as inequitable.

"Permanent injunctive relief is an extraordinary remedy that is granted only when there is no other way to avoid irreparable harm to the plaintiff." *Lewis Invs., Inc. v. City of Iowa City*, 703 N.W.2d 180, 185 (Iowa 2005).

> A plaintiff seeking permanent injunctive relief must establish "(1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy available."

*City of Okoboji v. Parks*, 830 N.W.2d 300, 309 (Iowa 2013) (quoting *Cmty. State Bank, Nat'l Ass'n v. Cmty. State Bank*, 758 N.W.2d 520, 528 (Iowa 2008)).

The court must undertake "a comparative appraisal of all of the factors in the case," and consider the following:

> (a) the character of the interest to be protected,
> (b) the relative adequacy to the plaintiff of injunction and of other remedies,
> (c) plaintiff's delay in bringing suit,
> (d) plaintiff's misconduct,

(e) the relative hardship likely to result to defendant if injunction is granted and to plaintiff if it is denied,

(f) the interests of third persons and of the public, and

(g) the practicability of framing and enforcing the order or judgment.

*Helmkamp v. Clark Ready Mix Co.*, 214 N.W.2d 126, 130 (Iowa 1974) (quoting Restatement (Second) of Torts, Tentative Draft No. 19, § 936(1)).

"When determining whether an injunction is the proper remedy, the court must weigh the relative hardship to each party." *In re Langholz*, 887 N.W.2d 770, 779 (Iowa 2016). Courts must structure permanent injunctions so that it will provide relief to the plaintiff without "interfer[ing] with the legitimate and proper actions of the person against whom it is granted." *Id.* at 779–80.

"In equity cases, especially when considering the credibility of witnesses, [we] give[] weight to the fact findings of the district court, but [we are] not bound by them." Iowa R. App. P. 6.904(3)(*g*). The Commission presented credible opinion testimony from experienced pilots familiar with the airport. The district court credited their testimony that the grain leg poses a hazard to aviation there. So do we. The other runway would be risky to use in a strong crosswind common to that location. The structure is not easy to see in certain weather conditions. The higher approach requires a steeper descent poorly suited to some types of aircraft. A distracted pilot might fly into the twelve-story elevator, with fatal consequences. We affirm the district court's finding that the grain leg constitutes a nuisance and hazard to aviation. It is the $200 daily penalty accruing during this appeal that gives us pause.

Iowa Code section 329.14 provides, "Each violation of [the airport zoning] chapter or of any regulations, order, or rules promulgated pursuant to this chapter, shall constitute a simple misdemeanor and

each day a violation continues to exist shall constitute a separate offense." The statutory fine for a simple misdemeanor is "at least sixty-five dollars but not to exceed six hundred twenty-five dollars." *Id.* § 903.1(*a*).

Although the district court gave the Danners nine months to abate the nuisance before commencing the $200 daily penalty, the Danners' appeal was pending during that grace period. The district court did not find the Danners in contempt or in willful violation of the court's abatement order. The Commission's case against the Danners was no slam dunk. It is undisputed that the Danners fully complied with the FAA directive to paint the structure and place red lights on top. The FAA adjusted the flight path by 100 vertical feet to accommodate the grain leg. The FAA determined that these measures alleviated the danger to aviation posed by the structure.[6] The Commission failed to appeal the FAA no-hazard determination. Further, despite the trial testimony that the grain leg poses a hazard, the Commission waited nearly two years to file this action. The Danners presented uncontroverted testimony that the cost to remove the grain leg and rebuild it elsewhere is roughly $450,000 and that it would cost several hundred thousand dollars to modify the grain leg by reducing its height. We reject as speculative the testimony that the grain leg will impede efforts to obtain future grants from the same federal government that deemed the structure nonhazardous, especially since grants of $284,466 and $263,200 were awarded after the grain leg was built. We factor these considerations into our equitable calibration of the postappeal deadline to bring down the grain leg.

---

[6]Unlike the district court, we give some evidentiary weight to the determination by federal aviation authorities that the grain leg is not a hazard to aviation.

The Danners presented a question of first impression in this jurisdiction as to whether the FAA's aeronautical study and no-hazard determination preempted the Commission's contrary determination that the grain leg is a hazard to aviation. While the district court, court of appeals, and now our court declined to give the FAA letter preemptive effect, this legal issue was not finally resolved until our opinion today. The caselaw in other jurisdictions is conflicting, and the Danners' position had some support. *See, e.g., Big Stone*, 161 F. Supp. 2d at 1021. We find the Danners pursued this appeal to conclusion based on their good faith and objectively reasonable belief in their legal position.

Although we now affirm the district court's nuisance finding, this was a fair fight on the merits. Enforcement of the per diem penalty under these circumstances would have a chilling effect on a litigant's right to appeal a question of first impression in this jurisdiction. The Danners exercised their right to appeal, which has now run its course. We affirm the injunction and hold abatement is required, but conclude it would be inequitable to impose the $200 daily penalty on the Danners from May 1, 2018, as originally ordered by the district court until they abate the nuisance. We elect to vacate the daily $200 penalty accruing during this appeal. *Cf.* Iowa Code § 329.4(9) (suspending enforcement penalties during appeal from extraterritorial airport hazard determination); *Palmer Coll. of Chiropractic v. Iowa Dist. Ct.*, 412 N.W.2d 617, 622 (Iowa 1987) (holding in contempt proceeding that failure to obey injunction constituted a single continuous violation and setting aside daily penalty); *see also Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937, 968 (Conn. 2005) (affirming order suspending per diem penalties during pendency of action).

The district court, to its credit, allowed the Danners a nine-month grace period to abate the nuisance. *See Palmer Coll. of Chiropractic*, 412 N.W.2d at 622 (commending the district court for allowing time to comply with its injunction). We renew this nine-month period from the date procedendo issues.

### IV. Disposition.

For the above-stated reasons, we vacate the decision of the court of appeals, vacate the $200 daily penalty, and affirm the district court judgment as modified to require the Danners to abate the nuisance within nine months from the effective date of our opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED AS MODIFIED.**

All justices concur except McDonald, J., who takes no part.