# IN THE COURT OF APPEALS OF IOWA

No. 22-1044
Filed April 26, 2023

**SAFE BUILDING COMPLIANCE & TECHNOLOGY,**
    Plaintiff-Appellee,

**vs.**

**MICHELLE BERNHOLTZ, n/k/a MICHELLE NAUGHTON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Lawrence P. McLellan, Judge.

A former director of a nonprofit corporation challenges some provisions of the district court's ruling she is liable for misappropriated funds. **AFFIRMED.**

Theodore W. Craig, David M. Repp, and Rachel L. Soderstrum of Dickinson, Mackaman, Tyler, & Hagen, P.C., Des Moines, for appellant.

Billy J. Mallory and Trevor A. Jordison of Mallory Law, West Des Moines, for appellee.

Heard by Greer, P.J., and Chicchelly and Buller, JJ.

**GREER, Presiding Judge.**

Safe Building Compliance & Technology (SBCT), a nonprofit corporation, sought to hold former director Michelle Naughton[1] liable for misappropriated funds in the amount of $481,481. Naughton admitted liability for some corporate funds that were improperly used on personal expenses but challenged others as expenses that were approved by the board of directors or spent after she resigned her position as director. Following a trial to the bench, the district court ordered Naughton to reimburse SBCT a total of $269,290.94.

On appeal, Naughton challenges some of the court's ruling. She disputes her liability for $78,425.38 spent on disability- and life-insurance policies for herself and her husband, Denny Bernholtz; $19,900 for excessive lease payments to 421 Main, LLC, a limited liability company owned by Naughton and Bernholtz; and $144,077 for construction and renovation expenses for the property owned by 421 Main.[2]

**I. Background Facts and Proceedings.**

Naughton and Bernholtz formed SBCT in 2011, organized under Iowa Code chapter 504, which is the Revised Iowa Nonprofit Corporation Act. Pursuant to

---

[1] Michelle was formerly known as Michelle Bernholtz. We refer to her as Naughton throughout.

[2] The district court also ordered Naughton to reimburse SBCT $18,484.25 for payments SBCT made on loans Naughton and Bernholtz took out against their life insurance policies and $4404.31 spent on cell phone bills for Naughton's and Bernholtz's family members. Additionally, Naughton was ordered to pay $4000 in punitive damages. Naughton does not contest these portions of the ruling, and we limit our discussion of these issues to the extent possible.

Because SBCT did not cross-appeal, we also limit how much we rehash the claims about expenditures for which the district court determined Naughton was not liable.

SBCT's articles of incorporation, one of the nonprofit's purposes was "[t]o lessen the burdens of . . . governmental agencies by performing building inspection and evaluation services, lead and energy assessment services, zoning consulting services, and building code and other regulatory compliance services" that the "governmental agencies would otherwise be required to perform." The corporation was to be governed by its board of directors; Naughton and Bernholtz were the only directors at the corporation's inception but were soon joined by three additional directors—Cody Christensen, Mark Chidley, and T.J. Bangs. In 2015, Bangs left the board and was replaced by Beth Gibbins.

A conflict-of-interest policy was included in SBCT's bylaws. The policy defines certain terms, such as an "interested person," which is "[a]ny director, principal officer, or member of a committee with governing board delegated powers, who has a direct or indirect financial interest, as defined below." Under the policy:

> A person has a financial interest if the person has, directly or indirectly, through business, investment, or family:
> a. An ownership or investment interest in any entity with which the Organization has a transaction or arrangement,
> b. A compensation arrangement with the Organization or with any entity or individual with which the Organization has a transaction or arrangement, or
> c. A potential ownership or investment interest in, or compensation arrangement with, any entity or individual with which the Organization is negotiating a transaction or arrangement.
> Compensation includes direct and indirect remuneration as well as gifts or favors that are not insubstantial.
> A financial interest is not necessarily a conflict of interest. Under Article III, Section 2, a person who has a financial interest may have a conflict of interest only if the appropriate governing board or committee decides that a conflict of interest exists.

The person with the possible conflict had a duty to disclose it to the board, and then it would become the board's responsibility to determine whether a conflict of interest existed:

> After disclosure of the financial interest and all material facts, and after any discussion with the interested person, he/she shall leave the governing board or committee meeting while the determination of a conflict of interest is discussed and voted upon. The remaining board or committee members shall decide if a conflict of interest exists.

If the board determined a conflict existed, it was required to follow the procedure set forth in the policy:

> a. An interested person may make a presentation at the governing board or committee meeting, but after the presentation, he/she shall leave the meeting during the discussion of, and the vote on, the transaction or arrangement involving the possible conflict of interest.
> b. The chairperson of the governing board or committee shall, if appropriate, appoint a disinterested person or committee to investigate alternatives to the proposed transaction or arrangement.
> c. After exercising due diligence, the governing board or committee shall determine whether the Organization can obtain with reasonable efforts a more advantageous transaction or arrangement from a person or entity that would not give rise to a conflict of interest.
> d. If a more advantageous transaction or arrangement is not reasonably possible under circumstances not producing a conflict of interest, the governing board or committee shall determine by a majority vote of the disinterested directors whether the transaction or arrangement is in the Organization's best interest, for its own benefit, and whether it is fair and reasonable. In conformity with the above determination it shall make its decision as to whether to enter into the transaction or arrangement.

The process surrounding compensation for a voting member or director was less ambiguous. Directors who received compensation from SBCT were not allowed to vote "on matters pertaining to that member's compensation" and were also "prohibited from providing information to any committee regarding compensation."

Naughton and Bernholtz were not only directors for SBCT, they were also employees of the nonprofit. They were paid a salary by the corporation and received benefits and other perks, such as life insurance; disability insurance; gym memberships; and access to trainers, food, work vehicles (that they also drove during their personal time), and fuel.

In October 2013, 421 Main purchased a building in Slater, Iowa. Over the next couple of years, SBCT spent more than $100,000 renovating 421 Main's building. At the point the expenditures began, SBCT worked out of a property in Huxley, Iowa, and did not have a contractual relationship with 421 Main.

Beginning June 1, 2014, SBCT leased the main floor of 421 Main's building, paying the limited liability company $1000 per month. The building also had a second floor, where Naughton and Bernholtz's family lived. Per the lease SBCT entered into with 421 Main, SBCT paid all "utilities and services . . . used on the premises, including all electricity, gas, sewer, garbage/trash removal, janitor/cleaning and snow removal." Accordingly, Naughton and Bernholtz's family did not pay any utilities for their residence.

SBCT entered into a number of leases with the limited liability company for the premises in Slater; the term lengths were irregular, and the rent increased with each contract. SBCT paid 421 Main $1000 per month from June 1, 2014, through March 31, 2015; $1350 per month from April 1, 2015, through November 30, 2016; $1850 per month from December 1, 2016, through January 30, 2018; and $2000 per month from February 1, 2018, through September 30, 2018.

Eventually, Naughton and Bernholtz began having marital problems, and Naughton filed a dissolution petition in July 2017. A few months later, in October,

she resigned as a director of SBCT and quit her employment. Gibbins and Chidley resigned from the board around the same time—leaving just Bernholtz and Christensen as directors.[3]

Bernholtz died in May 2018.[4] At that time, SBCT had four full-time and four part-time employees, and Christensen was left as the only director. So, following Bernholtz's death, his brother Chad took over as the president and treasurer for SBCT and sat on the board of directors.

After coming on board, Chad found a letter Bernholtz wrote to the IRS that purported to provide "[i]nformation about [SBCT] and [Naughton's] misuse of [SBCT] funds."[5] This, along with concerns Bernholtz previously shared with Chad, led SBCT to seek a forensic analysis of the corporation's accounts. SBCT hired HDH Advisors (HDH) to conduct the forensic analysis.

In April 2019, HDH provided SBCT a report outlining:

> the amount of excess benefits received by [Naughton] and [Bernholtz] in the form of excess compensation, payment of personal expenses using SBCT funds, the payment of above fair market value rent to a related-party entity solely owned by [Naughton] and [Bernholtz] and the excess payment of constructions expenses by SBCT for a building owned through the same related-party entity.

---

[3] In April 2017, the Internal Revenue Service (IRS) notified SBCT that it was conducting a review of their 2014 tax records and that SBCT might lose its tax-exempt status. Following the audit, the IRS formally revoked SBCT's tax-exempt status in October 2017; as a result, SBCT is required to refile income tax returns and pay income tax going back to 2014 under the assumption that SBCT is a for-profit corporation. This IRS audit was focused on whether SBCT could maintain its tax-exempt status; the purpose was not to uncover misappropriated funds.

[4] While Naughton and Bernholtz reached a dissolution agreement in mediation, it had not yet been finalized by a court; they remained married at the time of his death.

[5] It is unclear if the letter was ever sent to or received by the IRS.

The report covered several areas of expenses and concluded that Naughton and Bernholtz "privately benefitted from their roles as directors and operators of SBCT" and that the pair received $481,481 "to the detriment of the non-profit."

Armed with the report, SBCT filed suit against Naughton, alleging she misappropriated SBCT funds and seeking reimbursement of the whole $481,481 from her. While not included in the original petition, SBCT would later clarify that it believed Naughton was liable for violating the standards for a director of a nonprofit as governed by Iowa Code section 504.832 (2020).

SBCT tried its case to the bench over three days in December 2021. It largely relied on the testimony of Duane Tolander, a certified public accountant and a partner and managing director of HDH, who worked on the forensic analysis of SBCT.

Tolander testified the forensic analysis showed SBCT paid $107,350.51 for life insurance and disability policies for Naughton and Bernholtz; the other employees were not offered these insurance products. Additionally, none of this amount was shown on Naughton's or Bernholtz's W-2s as part of their compensation for employment.

Of the total, $18,484.25 was for payments made on loans Naughton and Bernholtz took out against their life insurance policies. Naughton admitted liability for this amount at trial. But she contested liability for the rest, claiming she was not liable for payments made by SBCT after she resigned her position as director ($10,440.88) and that the rest of the amount spent on life- and disability-insurance premiums ($78,425.38) was properly spent by SBCT on a benefit offered to herself and Bernholtz as employees, which the board approved. Alternatively, she

maintained that even if she was liable for the payments made on her behalf, she could not be held liable for the premium payments made for Bernholtz. She argued SBCT should have brought claims for those premiums against Bernholtz's estate rather than seeking to hold her personally liable.

SBCT also sought $144,007.11 in reimbursement for monies SBCT paid for the renovation and construction of 421 Main's building. According to the forensic analysis report, this money was spent to renovate both the office space SBCT used and the second floor, residential area where Naughton and Bernholtz's family moved into and lived. At the time SBCT started spending money on the renovation—July 2013—SBCT was still paying to rent office space somewhere else and was not yet in a contractual relationship with 421 Main. When it did enter a lease for mid-2014,[6] SBCT contracted to take the premises "as is." But SBCT continued to expense and capitalize costs of the renovation through July 2015. During his testimony at trial, Tolander agreed that tenants sometimes pay for a "build out" of their own space but testified that he did not see anything in the minutes from SBCT director meetings showing that the board approved of this undertaking. Eventually, after she left the corporation and Bernholtz's subsequent death, which left her the sole owner of 421 Main, Naughton terminated the lease of SBCT and sold the building. Naughton retained all improvements to the premises and any profit from the sale of the building.

Additionally, SBCT sought $27,750 in reimbursement for what it alleged were excessive rent payments to 421 Main. Tolander testified how this amount

---

[6] Tolander testified that a physical lease was never found for this period.

was reached, explaining that as part of the forensic analysis, HDH "went through a process of looking at what was the lease cost prior to moving to 421 Main in Slater, what's the lease cost since then, and then also what was the lease cost while they were residing at 421 Main." They compared the cost per square foot of what SBCT paid to 421 Main, taking into account what other costs were or were not covered (such as whether utilities were included in the rent) and what benefits a certain location may have over another (size of town, access to amenities, closeness to larger cities, etc.), with the cost to rent other office spaces. Tolander also noted how short the length of SBCT's leases were with 421 Main, opining that lease terms are "typically going to be five to seven years with minimal increases during that time period." While at the 421 Main building, SBCT's rent increased from $1000 per month in March 2015 to $1850 per month by December 1, 2016. Tolander opined the rent of $1000 per month was reasonable; he determined SBCT should have paid $42,000 in rent between April 1, 2015, and September 30, 2018. By determining what SBCT actually paid in rent over that time ($69,750) and subtracting the "reasonable" rent amount of $42,000, he determined SBCT spent $27,750 in excessive rent.

On cross-examination, Tolander was directed to various minutes from SBCT's board meetings throughout the years. For example, the February 26, 2013 minutes include the following:

**FINANCIALS**

Year end 2012 financials were reviewed and approved unanimously.

2013 Budget was reviewed including:

- Proposed salary increases for all staff
- Proposed additional benefits including:
  - long term disability
  - short term disability
  - wellness benefits

2013 Budget was approved unanimously

Naughton suggested this showed the board approved the cost of insurance for herself and Bernholtz, which should preclude her from being liable for the premiums. Tolander noted that life insurance was not included in the list and, even if it was, there was no indication what the board approved specifically, that it considered whether this was a conflict-of-interest transaction for some board members (Naughton and Bernholtz), or that proper conflict-of-interest procedures were followed. There were similar questions and answers about the costs of building renovations and the lease agreements into which SBCT and 421 Main entered.

Naughton testified in her own defense at trial. She admitted liability for some expenditures (which are not an issue on appeal), noting she was told by the accountant SBCT used that she should not be running personal expenses through SBCT and needed to pay money back to the nonprofit. She also admitted that she repeatedly presented financial reports to the board for its approval knowing inappropriate personal charges (such as family cell phone costs) were included in those reports.

There were also charges run through SBCT's accounts that were miscoded in SBCT's books. Highlighting some of those charges with questions to Naughton,

SBCT showed there were payments to a pet boarding service, her son's college bookstore, and a local bicycle shop, as well as concert tickets for herself and her son, which were listed in SBCT's books and showed the payee as a different entity, such as to the local gas station, Amazon, and Staples. Naughton refused to address whether it was done "in an attempt to cover up" the expenses but admitted she was mainly the person responsible for inputting such information.[7]

Finally, Naughton agreed that the board never followed the conflict-of-interest policy included in SBCT's bylaws. But she testified the general practice was

> that we brought the issues in front of the board and if they had questions, we answered the questions until they were satisfied; and if any of them had voted no for what we were wanting to go ahead with, honestly, we would not have gone again. We would have either satisfied what they were wanting or altered what we proposed to do.

Naughton claimed the board "adhered to the spirit of the conflict of interests policy" because "items were brought to the board in advance" and were discussed "at length" before being approved. She claimed that following this general standard, the board approved the insurance benefits for herself and Bernholtz and also the renovation expenses for 421 Main's building. Naughton testified they were "very upfront with what the [relocation] plans were, that [they] owned the building, that

---

[7] This line of questioning went to SBCT's request for $41,737 in reimbursement for what it titled "Amazon/Grocery/Department Store Expenses." The district court did not award SBCT any damages under this category, concluding that while the forensic analysis "raise[d] questions [about] whether these are business expenses the court does not find [SBCT] proved by a preponderance of the evidence they were not business expenses." The lack of award is contradicted by the court's specific finding that $529 that was spent on a suit for Naughton's son "was not a business expense because Naughton testified it was not." But SBCT did not cross-appeal, and the lack of award for this section of expenses is not an issue for our consideration.

this was the situation," so the board knew of Naughton and Bernholtz's personal financial interest in paying for the renovations and then moving the business to 421 Main's building. She denied that she and Bernholtz took part in votes where they had pecuniary interests.

Chidley, who was a member of SBCT's board of directors from 2011 until late 2017, also testified. Chidley remembered discussing "both pay and benefits as an overall total compensation package" for SBCT employees, but when asked about specifics, he testified he remembered "in general terms the discussion about overall compensation, and we approved that." Chidley remembered being aware that Naughton and Bernholtz owned 421 Main, which owned the building to which SBCT was relocating. He did not seem to have specific memories of approving the move or the renovation expenses; he testified:

> Q. And do you remember approving of the move to Slater? A. I believe I did. I have no reason to—I mean, don't remember the meeting, but I was well aware of everything that was going on around it and have no reason to believe I wasn't in full support.
> Q. Is renovating your office space something that's unusual for companies in your experience? A. No.
> Q. And did you approve of the renovation? A. I believe so, yes.

In discussing the rent for SBCT, Chidley remembered asking "about the rent in fairness of a comparable space so that [SBCT] wasn't being overcharged," but he did not recall any investigation into or information regarding other properties available for rent and what the cost would be. Chidley also testified that while the board approved yearly profit and loss statements, it never looked at any receipts to verify that the charges showing up under each category actually belonged in those categories. When asked specifically if he was aware that Bernholtz used the nonprofit's account to pay for a mattress pad and body fat scale, Chidley

testified he did not know and would not have approved of such an expense if he was aware.

Gibbins, another SBCT board member, also testified and likewise shared Chidley's views; she knew of various conflicts but felt they had information to allow them to proceed, yet she admitted she would not have approved of the payment of personal expenditures from the nonprofit's account to Bernholtz and Naughton had she known about them.

In its written ruling, the district court found Naughton liable for $269,290.94 of the $481,481 alleged as damages by SBCT. The court broadly agreed with Naughton that she was not liable for any monies spent by SBCT after Naughton resigned on October 12, 2017, and reduced the amounts under the various categories accordingly. Regarding the insurance premiums, the court concluded Naughton was not liable for the $10,440.88 spent by SBCT after Naughton's resignation but was liable for $18,484.25 for loan payments and the $78,425.38 in premium payments. The district court relied on Iowa Code section 504.834, which deals with "loans to or guarantees for directors and officers" in deciding the payments for insurance premiums were improper. The court also found Naughton liable for the whole amount requested by SBCT for construction and renovation expenses of 421 Main's building—$144,077. The court reasoned:

> the construction and renovation expenses constitute conflict of interest transactions between SBCT, Naughton and Bernholtz. Naughton must prove the transactions were fair and reasonable to SBCT. She failed to establish this. She produced no evidence on this issue other than her statements 421 Main had more capitalized costs and expenses than HDH's report indicates. She provided no documentation establishing what 421 Main incurred. The only documentation was contained in HDH's report. Naughton is liable to SBCT for $144,077.

14

Finally, the court held Naughton liable for $19,900 in excessive rent payments made by SBCT to 421 Main. The court agreed with SBCT that any amount more than $1000 per month was excessive but subtracted the excess paid after Naughton's resignation ($7850) from SBCT's requested amount, reaching the awarded amount of $19,900.

Naughton appeals.

## II. Standard of Review.

Because this case was tried as a law action to the bench, our review is for correction of errors at law. *Carroll Airport Comm'n v. Danner*, 927 N.W.2d 635, 642 (Iowa 2019). And we review questions of statutory interpretation for errors at law. *Williams v. Bullock*, 960 N.W.2d 473, 477 (Iowa 2021).

## III. Discussion.

Each member of the board of directors for a nonprofit corporation must, when discharging his or her duties as a director, act in good faith and in a manner that "the director reasonably believes to be in the best interests of the corporation." Iowa Code § 504.831(1)(a), (b). Directors have both a duty of care and a duty of loyalty. *See* 6 Matthew G. Doré, *Iowa Practice Series: Business Organizations* § 40:26 (Oct. 2022 update) [hereinafter Doré, *Business Organizations*]. The duty of loyalty "means that a director is required to exercise his or her power in the interest of the nonprofit corporation rather than in his or her own interest or the interest of another person or entity" and "should avoid using his or her position in a manner that would result in pecuniary gain for the director or a member of the director's family." *Id.*

All parties agree that as a director, Naughton had a duty to act in good faith as set out in Iowa Code section 504.831. She also does not dispute that the payments for insurance benefits, rent expenses, and renovation expenses were conflict-of-interest transactions. But Naughton argues the district court stopped there and failed to apply an analysis of how section 504.833(2) would allow the board-approved actions even though Naughton benefitted from them. She asserts that a reading of chapter 504 as a whole sets out the proper procedure for approving a conflict transaction involving a board director and that although technically she did not adhere to SBCT's conflict policy, the bylaw was adhered to in "substance and spirit." In our review, we are mindful of our hindsight view of the nonprofit governing board's actions and avoid reforming any bad decisions the board may have made even though it was armed with appropriate knowledge of the conflicts. Thus, we look at each conflict transaction separately to determine if there was a breach of the duty to act in good faith and whether the corporate protections under the statute and SBCT's governing documents were followed so that the board operated in the best interest of the corporation.

**Life- and Disability-Insurance Premiums.** First, we review the district court's determination Naughton is liable for the $78,425.38 SBCT paid for life- and disability-insurance premiums for Naughton and Bernholtz—there were ten life-insurance policies with only the individuals as beneficiaries and three disability-policies. Here on appeal, Naughton argues the district court wrongly applied section 504.834 to these facts because it governs "loans to or guarantees for directors and officers"—not the payment of premiums as part of compensation for employees of the corporation. She reiterates that the life insurance and disability

insurance were benefits offered to them as employees of SBCT, which she maintains the board properly approved. Alternatively, if we conclude the payments for insurance premiums were not properly authorized by SBCT, she maintains she should not be held liable for the payments made for Bernholtz's benefit because SBCT should have sought reimbursement from Bernholtz's estate and, due to the time-bar in section 633.410, is now precluded from doing so.

Section 504.834 provides:

> 1. A corporation shall not lend money to or guarantee the obligation of a director or officer of the corporation.
> 2. This section does not apply to the situation where the director or officer is a full-time employee of the corporation and involves any of the following:
> a. An advance to pay reimbursable expenses reasonably expected to be incurred by a director or officer.
> b. An advance to pay premiums on a policy of life insurance if the advance is secured by the policy's death benefit proceeds or cash surrender value, or both.
> c. Advances pursuant to part 5 of this subchapter.
> d. Loans or advances pursuant to employee benefit plans.
> e. A loan secured by the principal residence of an officer.
> f. A loan to pay relocation expenses of an officer.
> 3. The fact that a loan or guarantee is made in violation of this section does not affect the borrower's liability on the loan.

Naughton maintains this section is inapplicable because it deals with "loans to" and "guarantees for" directors, while SBCT's payment of the contested insurance premiums was for compensation. But we cannot say the facts established at trial show that the premiums were part of Naughton's and Bernholtz's compensation as employees. Tolander testified, without contradiction, that the price of the insurance premiums was not included on Naughton's or Bernholtz's W-2s, suggesting it was not properly part of their compensation. Additionally, Naughton pointed to the February 26, 2013 minutes to support her claim that the board

approved the insurance benefits as part of compensation, but life insurance—which makes up the great majority of the insurance policies at issue—was not included as one of the benefits being considered by the board. And, according to the forensic analysis report, "[a]ll life insurance and non-cancellable disability policies existed prior to the formation of SBCT," suggesting these policies were not so much a benefit offered to Naughton and Bernholtz by SBCT but an obligation of the pair that the nonprofit took over paying. What we can say is that if section 504.834 applies to the facts here, it does not provide Naughton any relief, as SBCT's payment of the life insurance premiums was not "secured by the policy's death benefit proceeds or cash surrender value, or both." Iowa Code § 504.834(2)(b).

Assuming we accept Naughton's argument that the insurance policies were part of an employee benefit package, we think the better method of reviewing Naughton's liability for the insurance premiums is to consider whether Naughton is liable under section 504.832. Section 504.832 starts with the premise that a director is not liable to the corporation for either the director's action or inaction unless the party asserting liability—here, SBCT—can establish both:

> a. That section 504.202, subsection 2, paragraph "d", or section 504.901 or the protection afforded by section 504.833 or 504.836, if interposed as a bar to the proceeding by the director, does not preclude liability.
> b. That the challenged conduct consisted or was the result of one of the following:
> (1) Action not in good faith.
> (2) A decision that satisfies one of the following:
> (a) That the director did not reasonably believe to be in the best interests of the corporation.
> (b) As to which the director was not informed to an extent the director reasonably believed appropriate in the circumstances.

(3) A lack of objectivity due to the director's familial, financial, or business relationship with, or lack of independence due to the director's domination or control by, another person having a material interest in the challenged conduct which also meets both of the following criteria:

(a) Which relationship or which domination or control could reasonably be expected to have affected the director's judgment respecting the challenged conduct in a manner adverse to the corporation.

(b) After a reasonable expectation to such effect has been established, the director shall not have established that the challenged conduct was reasonably believed by the director to be in the best interests of the corporation.

(4) A sustained failure of the director to devote attention to ongoing oversight of the business and affairs of the corporation, or a failure to devote timely attention, by making, or causing to be made, appropriate inquiry, when particular facts and circumstances of significant concern materialize that would alert a reasonably attentive director to the need therefor.

(5) Receipt of a financial benefit to which the director was not entitled or any other breach of the director's duties to deal fairly with the corporation and its members that is actionable under applicable law.

Iowa Code § 504.832(1). Of the protections listed in section 504.832(1)(a), the only one we can say Naughton "interposed" is section 504.833.[8] *See Meade v.*

---

[8] Section 504.202(2)(d) allows the nonprofit's articles of incorporation to set forth any of the following:

(1) A provision eliminating or limiting the liability of a director to the corporation or its members for money damages for any action taken, or any failure to take any action, as a director, except liability for any of the following:

(a) The amount of a financial benefit received by a director to which the director is not entitled.

(b) An intentional infliction of harm on the corporation or its members.

(c) A violation of section 504.835.

(d) An intentional violation of criminal law.

(2) A provision set forth in the articles of incorporation pursuant to this paragraph shall not eliminate or limit the liability of a director for an act or omission that occurs prior to the date when the provision becomes effective. The absence of a provision eliminating or limiting the liability of a director pursuant to this paragraph shall not affect the applicability of section 504.901.

*Christie*, 974 N.W.2d 770, 776 (Iowa 2022) (considering the meaning of "interposed by the director" in section 490.831, which sets the standards of liability for directors of for-profit corporations, and deciding "[t]he phrase 'by the director' naturally suggests that the director bears the burden of interposing one of the defenses to liability listed in the statute").

To see if the protection of Section 504.833 precludes liability, we start with its terms. That section allows the board to approve a transaction in which a director has a conflict of interest when "[t]he material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board and the board or committee of the board authorized, approved, or ratified the transaction." Iowa Code § 504.833(2)(a). But even if we believed the

---

Section 504.901 is similar, stating:

> 1. Except as otherwise provided in this chapter, a director, officer, employee, or member of a corporation is not liable for the corporation's debts or obligations and a director, officer, member, or other volunteer is not personally liable in that capacity to any person for any action taken or failure to take any action in the discharge of the person's duties except liability for any of the following:
>     a. The amount of any financial benefit to which the person is not entitled.
>     b. An intentional infliction of harm on the corporation or the members.
>     c. A violation of section 504.835.
>     d. An intentional violation of criminal law.
> 2. A provision set forth in the articles of incorporation eliminating or limiting the liability of a director to the corporation or its members for money damages for any action taken, or any failure to take any action, pursuant to section 504.202, subsection 2, paragraph "d", shall not affect the applicability of this section.

Section 504.901 provides broad protection for directors, and section 504.202(2)(d) allows for "the ability to include a liability shield provision in a nonprofit corporation's articles of incorporation." Doré, *Business Organizations* § 40.26.

Section 504.836 allows a director to take advantage of business opportunities so long as the conflict-of-interest procedures outlined in section 504.833 are followed.

evidence at trial established the board members who did not have a direct interest in the payment of the insurance premiums—the members who were not Naughton and Bernholtz—were informed of all the material facts surrounding the transactions and approved them, Naughton would not be entitled to the protections of section 504.833 because, as she admitted, the board never followed the conflict-of-interest procedures in SBCT's bylaws, which added to the requirements imposed by the statute. *See id.* § 504.833(6) (allowing "[t]he articles, bylaws, or a resolution of the board [to] impose additional requirements on conflict of interest transactions"). And based upon testimony of the board members who had no conflicts, neither remembered details of the material facts of the transactions, and the minutes of meetings do not detail those facts.

Next, SBCT had to prove[9] that SBCT's payment of the insurance premiums for Naughton's and Bernholtz's benefit was the result of one of the following:

---

[9] The district court, relying on case law, shifted the burden to Naughton to prove that the challenged transactions were fair and reasonable to the corporation. *See Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 453 (Iowa 1988) ("When self-dealing is demonstrated, the duty of loyalty supersedes the duty of care, and the burden shifts to the director to prove that the transaction was fair and reasonable to the corporation." (altered for readability)). No reported Iowa decision has applied *Cookies* to review conflicted nonprofit transactions, and we note that *Cookies* interpreted a version of the for-profit chapter that has since been replaced. Because the language in section 504.832 assigns the burden to "the party asserting liability in a proceeding" to establish "both" that no defense protects the director from liability and that the director failed to adhere to the standards of conduct when discharging the director's duty, we assume without deciding that the burden remains with SBCT, which differs from the analysis applied to a for-profit corporation. *See Hora v. Hora*, No. 22-0259, 2023 WL 1809035, at *7 n.2 (Iowa Ct. App. Feb. 8, 2023) ("[W]e agree with the commentary that *Cookies* is still largely good law and the modern [for-profit] statute should be interpreted similarly or identically." (citing Doré, *Business Organizations* § 28:11)). We note this issue is not dispositive to the appeal, as we conclude that SBCT carried its burden—so we would come to the same outcome regardless of whether Naughton or SBCT were assigned the burden by statute.

(1) Action not in good faith.

(2) A decision that satisfies one of the following:

(a) That the director did not reasonably believe to be in the best interests of the corporation.

(b) As to which the director was not informed to an extent the director reasonably believed appropriate in the circumstances.

(3) A lack of objectivity due to the director's familial, financial, or business relationship with, or lack of independence due to the director's domination or control by, another person having a material interest in the challenged conduct which also meets both of the following criteria:

(a) Which relationship or which domination or control could reasonably be expected to have affected the director's judgment respecting the challenged conduct in a manner adverse to the corporation.

(b) After a reasonable expectation to such effect has been established, the director shall not have established that the challenged conduct was reasonably believed by the director to be in the best interests of the corporation.

(4) A sustained failure of the director to devote attention to ongoing oversight of the business and affairs of the corporation, or a failure to devote timely attention, by making, or causing to be made, appropriate inquiry, when particular facts and circumstances of significant concern materialize that would alert a reasonably attentive director to the need therefor.

(5) Receipt of a financial benefit to which the director was not entitled or any other breach of the director's duties to deal fairly with the corporation and its members that is actionable under applicable law.

Iowa Code § 504.832(1)(b).

---

In our treatment of section 504.832, we presume the legislature had a reason for applying a different burden than *Cookies* applied, but as scholars specializing in corporate organizations have noted, chapter 504 "was drafted intentionally to mirror the Iowa Business Corporation Act [in chapter 490] . . . in many respects." Doré, *Business Organizations* § 40:1. Yet there are provisions in chapter 504 that limit liability exposure of corporate directors. *See* Doré, *Business Organizations* §§ 40:10, :30 (discussing the chapter's liability shield protection available for nonprofit directors under certain circumstances); *see also* *Vails v. United Cmty. Health Ctr., Inc.*, No. C11-4048-LTS, 2012 WL 6045941, at *17 (N.D. Iowa Dec. 5, 2012) ("Section 504.901 reflects an underlying policy of encouraging community members to serve as directors or officers of nonprofit organizations by granting them immunity and limiting their personal liability. The history of the statute also reflects the legislature's intent to reduce risk and uncertainty by narrowing the immunity exceptions.").

"Good faith" is "generally understood as an honest intention on the part of the director to act in the corporation's best interests." Doré, *Business Organizations* § 28:6. The record is devoid of evidence that the other directors were aware SBCT was paying for the life- and disability-insurance premiums of Naughton and Bernholtz. Naughton testified:

> we talked often about creating an employee compensation package that would allow us to have, you know, highly qualified employees that would stay with us, so that benefit package was as competitive as possible.
>     And so with that in mind, [Bernholtz] and I talked about these benefits. We brought them to the board. We just talked about, you know, each benefit and a little bit about what they would cost, answered any questions that the board might have, and then they approved providing them to the employees.

While retaining good employees for a nonprofit that provides a service could be an act done in the corporation's best interests, in our view, Naughton's testimony on this point is not credible. As previously mentioned, the minutes of the board meeting Naughton relies on to show approval by the board do not list life insurance as one of the benefits being considered. And Tolander testified no other employee was offered the life and disability insurance at issue here.[10] Plus, the payments for Naughton's and Bernholtz's premiums were not treated as compensation, as they were not included in their respective W-2s. Without any other explanation for the payments, we cannot say Naughton's action was in good faith or that she was entitled to the payment of the premiums. *See* Iowa Code § 504.832(1)(b)(1) (not in good faith); (5) (allowing director liability when the challenged action is "[r]eceipt

---

[10] There was a separate group disability insurance policy that all employees were offered. SBCT does not challenge this benefit as improper, and the cost of that insurance is not part of SBCT's request for reimbursement.

of a financial benefit to which the director was not entitled"). And Naughton's reason that the insurance made up an employee benefit package to retain good employees cannot credibly explain why SBCT should pay for ten life insurance policies for only herself and Bernholtz—who were, as it turned out, both receiving numerous other monetary benefits.

Relying on section 633.410, Naughton maintains she cannot be held liable for the premiums paid for Bernholtz's policies. While section 633.410(1) "forever bar[s]" claims against an estate that are not "filed with the clerk within the later to occur of four months after the date of the second publication of the notice to creditors or, as to each claimant whose identity is reasonably ascertainable, one month after service of notice by ordinary mail to the claimant's last known address," SBCT did not attempt to bring this claim against Bernholtz's estate, so section 633.410 is inapplicable. Reading between the lines, we think Naughton's actual complaint is that she's not the proper person to hold liable for expenditures of which Bernholtz was at least the initial beneficiary. But Naughton has pointed to no authority for this proposition. And, in fact, neither SBCT's articles of incorporation nor section 504.832 require that a director be personally financially benefitted to be liable for their action. Naughton cannot be held liable for Bernholtz's actions, but she can be liable for her actions that resulted in an improper financial benefit to someone other than herself.[11] *See id.*

___

[11] In spite of her protest, it is not clear Naughton was not benefitted financially by Bernholtz's life insurance premiums being paid. Bernholtz and Naughton remained married at the time of these transactions so, practically speaking, a financial benefit to one was also a financial benefit to the other. And Tolander testified Naughton was the named beneficiary of Bernholtz's policies.

§ 504.832(1)(b)(3) (allowing director liability where the party asserting liability proves the director's action was the result of "[a] lack of objectivity due to the director's familial . . . relationship with . . . another person having a material interest in the challenged conduct" and meets other criteria).

We agree with the district court; Naughton is liable to SBCT for the $78,425.38 SBCT paid for life- and disability-insurance premiums for Naughton and Bernholtz.

**Excessive Rent.** Next, Naughton challenges the district court's ruling she is liable for $19,900 in excessive rent SBCT paid to 421 Main. We apply the same statutory analysis to this decision as we did to the insurance premiums.

First, we consider whether section 504.833 affords Naughton any protection for SBCT's payment of rent to 421 Main. Naughton relies on her trial testimony that "when there was to be a proposed rent increase, [she] would do research regarding the rent, market rent in the area" and "looked at what [she] could find online for the area as far as what the market rent per square foot amounts were." She claimed she then presented that information to the board, and the board always approved the rent. But, even assuming this testimony to be true,[12] this

---

[12] While SBCT's rent to 421 Main increased three times while Naughton was member of the board, Naughton points to the minutes from just one board meeting where a rent increase is mentioned. And those minutes do not state the board approved the change. Rather, under a heading of "new business," the minutes simply state, "Rent to 421 Main St is increasing for 2017 to $1850 per month. City water, garbage service and snow removal is included." And, in fact, garbage service and snow removal were not included in the cost of rent. The written lease provided that the tenant was responsible "for all utilities and services which may be used on the premises, including all electricity, gas, sewer, garbage/trash removal, janitor/cleaning and snow removal." (The December 1, 2016 lease is not in our record, but the lease agreements that came before and after were included; in each of those, the lease terms about utilities remain consistent; and the forensic

procedure fails to meet the nonprofit's conflict-of-interest policy. So, section 504.833 does not afford Naughton any protection. *See* Iowa Code § 504.833(6)

And we conclude SBCT established that the agreement to pay rent of more than $1000 per month was not in good faith. *See id.* § 504.832(1)(b)(1). As credibly explained in Tolander's testimony and the forensic analysis report, SBCT paid $950 per month for rent before it moved to 421 Main's building. That transaction was an arm's-length transaction and, within the rental price, included the cost of electricity, gas, heating and air conditioning, water and sewage, garbage and trash disposal, and real estate taxes. Even at the initial rent of $1000 per month (which SBCT conceded was reasonable), SBCT's move to 421 Main's building cost it more in monthly rent and also required SBCT to pay for electricity, gas, sewer, garbage removal, cleaning, and snow removal (for both itself and Naughton and Bernholtz's family).

The record is devoid of explanation why SBCT entered into multiple short, irregularly termed leases with 421 Main as opposed to a typical five- to seven-year lease. And, other than the implication that Naughton's research suggested the market allowed for it, there is no explanation why each new lease came with a large increase of rent without any apparent benefit to SBCT (in April 2015 rent increased 35%, and in December 2016 it increased 37%). While Slater (where the 421 Main building was located) has similar amenities to Huxley, it has a smaller population, lies further from an entrance ramp onto Interstate 35, and is located further away from the larger population centers of Ankeny, Ames, and Des Moines.

---

analysis report states those same terms were included in the December 2016 lease as well).

Naughton's agreement to the near-doubling of the rent over a short period of time, and to which she was one of the recipients, cannot be understood to be in the corporation's best interests.

We agree with the district court; Naughton is liable for $19,900 in excessive rent SBCT paid to 421 Main.

**Construction and Renovation Expenses.** Finally, Naughton challenges the $144,077 of construction and renovation expenses for which the district court held her liable to SBCT.

We apply the same statutory analysis and, as with the other two categories, conclude that section 504.833 offers no protection to Naughton because— however much the board was told of the money SBCT would be spending to renovate the building owned by Naughton's and Bernholtz's limited liability company—the conflict-of-interest procedure contained in the nonprofit's bylaws was not followed. *See* Iowa Code § 504.833(6).

Next, we consider whether Naughton adhered to standards of conduct when discharging her duties as a director. *See id.* § 804.832(1)(b). Here, Naughton agreed to use $144,077 of the nonprofit's money to renovate a building for which the corporation had no ownership interest and which directly positively impacted Naughton's own investment. Tolander testified those expended monies for the buildout should have been paid by the landlord, not SBCT as tenant. At the time SBCT started funding the renovation, it had not entered into a lease contract with 421 Main and had no other type of business relationship with the entity. In other words, SBCT was paying bills it had no obligation to pay for the benefit of some other entity with which it had no relationship. Further, the renovations that were to

the portion of the property Naughton and Bernholtz used for their residence had no benefit to the corporation's operations. The board minutes on this subject only generally referenced the "build-out of new office space," not the residence. This could not be in the best interests of SBCT, so the decision was not in good faith.

We agree with the district court that Naughton is liable to SBCT for $144,077 in renovation expenses.

**IV. Conclusion.**

Having interpreted and applied Iowa Code section 504.832, we agree with the district court that Naughton is liable to SBCT for $78,425.38 in life- and disability-insurance premiums, $19,900 in excessive rent, and $144,077 in construction and renovation expenses. We affirm.

**AFFIRMED.**